DMP/DKK/JMH
F.#2014R01413

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -                                       15-CR-95 (S-3) (WFK)

DILKHAYOT KASMIOV and
AZIZJON RAKHMATOV,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY

RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Douglas M. Pravda
David K. Kessler
J. Matthew Haggans
Assistant U.S. Attorneys

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motion for an anonymous and partially sequestered jury in the trial of this matter. Jury selection is scheduled to commence on September 16, 2019. The government requests that the names, addresses and workplaces of members of both the venire and the petit jury not be revealed to the parties; that the jurors be kept together during recesses and taken to or provided lunch as a group each day during trial; and that they be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service. In short, the government asks that the Court empanel an anonymous, partially sequestered jury.

Courts in this District have routinely approved the use of anonymous juries in terrorism cases.[1] As explained in greater detail below, the factors warranting the use of

---

[1] See, e.g., United States v. Kaziu, 559 F. App'x 32, 37-38 (2d Cir. 2014) (upholding use of anonymous jury in prosecution for conspiracy to commit murder overseas and attempted provision of material support to the terrorist organization al-Shabaab); United States v. Ibrahim, 529 F. App'x 59, 65 (2d Cir. 2013) (affirming use of anonymous jury in case relating to plot to detonate fuel tanks at John F. Kennedy airport); United States v. Kadir, 718 F.3d 115, 121 (2d Cir. 2013) (affirming use of anonymous jury in case relating to terrorist plot at John F. Kennedy airport); United States v. al Farekh, No. 15 CR 268 (BMC), ECF No. 102 (E.D.N.Y. June 16, 2017) (granting government's request for an anonymous jury in case involving defendant, an al-Qaeda member, charged with conspiracy to murder U.S. nationals among other terrorism offenses); United States v. Hausa, No. 12 CR 134 (BMC), ECF No. 123 (E.D.N.Y. June 20, 2016) (granting government's request for an anonymous jury in case involving defendant charged with providing material support to al-Qaeda); United States v. Pugh, No. 15 CR 116 (NGG), 2015 WL 8481877 (E.D.N.Y. Dec. 9, 2015) (granting government's motion for an anonymous, partially sequestered jury in trial of defendant accused of providing material support to the Islamic State); United States v. Naseer, 10 CR 19 (RJD), Dkt. No. 361 (E.D.N.Y. Dec. 30, 2014) (approving use of anonymous jury where defendant was charged with conspiring to provide material support to al-Qaeda); United States v. Ahmed, No. 12 CR 661 (SLT), 2014 WL 6983438 (E.D.N.Y. Dec. 10, 2014) (approving use of anonymous jury in terrorism trial); see also United States v.

anonymous juries in these cases—especially, the seriousness of the charges and the expectation of publicity—make an anonymous jury necessary and appropriate in this case. In addition, because the case involves charges of material support to ISIS—a terrorist organization with a reputation for extreme and vicious violence, a fair trial requires empaneling an anonymous jury and the other protective measures requested herein.

I.      FACTUAL BACKGROUND

The defendants are charged in a superseding indictment with one count of conspiring to provide material support and one count of attempting to provide material support to the Islamic State of Iraq and al-Sham ("ISIS"), a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B.  See Indictment (S-3) (May 9, 2016) (Counts One and Two).  Defendant Rakhmatov is also charged with conspiring to use a firearm during and in relation to those offenses.  Id. (Count Three).

In brief, the charges arise from the efforts of both defendants, together with others, to provide material support to ISIS in the form of personnel and resources.  As the Court is aware, several co-defendants, including Abdurasul Juraobev and Akhror Saidakhmetov, devised a plan to travel to Syria, via Turkey, for the purpose of joining ISIS and engaging in violent jihad.  Juraboev and Saidakhmetov purchased airline tickets to travel from the United States to Turkey and, on February 25, 2015, Saidakhmetov was arrested while trying to board a flight to Istanbul, Turkey, from John F. Kennedy International

---

Stewart, 590 F.3d 93, 125 (2d Cir. 2009) (affirming use of anonymous jury in prosecution in the Southern District of New York of defense attorney and two co-conspirators for involvement with Sheikh Omar Abdel Rahman); United States v. Al Fawwaz, No. 98 CR 1023 (LAK), 2014 WL 5005917 (S.D.N.Y. Sept. 30, 2014) (granting government's request for an anonymous jury in prosecution relating to plot to bomb at the U.S. embassies in Kenya and Tanzania).

Airport ("JFK Airport") located in Queens, New York. (Juraboev was scheduled to depart in March 2015).

    A.    <u>Background Regarding ISIS</u>

ISIS is a foreign terrorist organization that, since 2013, has conducted terrorist attacks as part of ISIS's goal of forming an Islamic state or "caliphate." At various times over the past few years, ISIS has controlled territory in Syria, Iraq, and Libya, and maintains a presence in other countries as well. [2]

ISIS has claimed credit for numerous terrorist activities during that time frame, including attacks against Americans in the United States and against Westerners abroad. Specifically, ISIS supporters have claimed responsibility for the following attacks in the United States: the May 2015 shooting in Garland, Texas, at an exhibition featuring cartoons of the Prophet Mohammed; the December 2015 shooting in San Bernardino, California, at the Inland Regional Center; and the June 2016 shooting in Orlando, Florida, at the Pulse nightclub. ISIS supporters have also publicly expressed a desire to continue to target and attack the U.S. and the West.

---

[2] On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq, then known as Jam 'at al Tawid wa' al-Jahid, as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of al-Qaeda in Iraq as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham ("ISIS" – which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. In an audio recording publicly released on June 29, 2014, ISIS announced a formal change of its name to the Islamic State. On September 21, 2015, the Secretary of State added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

ISIS and its supporters have also claimed responsibility for many violent attacks in Europe and South Asia, including: the November 2015 shootings and suicide bombings in Paris, France, at the Bataclan concert hall, a sports stadium, and several restaurants; the July 2016 truck attack in Nice, France during Bastille Day celebrations; the December 2016 truck attack in Berlin, Germany at a Christmas market; the May 2017 suicide bombing in Manchester, United Kingdom at a concert; the August 2017 van attack in Barcelona, Spain; and an August 2018 suicide bombing in Kabul, Afghanistan.  Despite the degradation of their territorial control in Syria and Iraq, ISIS remains a potent FTO.  As recently as April 21, 2019 (Easter Sunday), ISIS claimed responsibility for a series of bombings in Sri Lanka that killed or wounded more than 700 people.

ISIS has released multiple audio and video messages purporting to be from its self-proclaimed leader, Abu Bakr al-Baghdadi, advocating continued violence by ISIS supporters.  On June 29, 2014, ISIS released an audio recording declaring a "caliphate" consisting of territory under ISIS control in Iraq and Syria, and stating that Baghdadi would be the "caliph" or "leader for Muslims everywhere."  On July 5, 2014, ISIS released a video recording in which Baghdadi urged Muslims from across the world to "do jihad in the cause of God, incite the believers and be patient in the face of this hardship."  On May 14, 2015, ISIS released an audio recording in which Baghdadi urged Muslims to take up arms on behalf of ISIS by either traveling to the Middle East to fight for ISIS or launching attacks wherever they were.  On September 29, 2017, ISIS released an audio recording in which Baghdadi again urged his followers to continue to attack the U.S. and its allies, saying: "Carry on your jihad and your blessed operations.  Let not the crusaders enjoy life in their homelands while your brothers are subjected to bombardment and destruction."  As recently

5

as April 2019—just weeks after an allied campaign ousted ISIS from a holdout in Baghouz, Syria—ISIS released an eighteen-minute video from al-Baghdadi, in which he stated, among other exhortations, that "jihad continues until judgment day"; congratulated ISIS cells in Libya, Burkina Faso and Mali on then-recent attacks or pledges of allegiance to ISIS; claimed that the Sri Lanka Easter Sunday bombings were "in revenge"; and exhorted ISIS followers to "drain their enemies of all their human, military, economic and logistical capabilities."

At trial, the government intends to introduce evidence that ISIS has aggressively and successfully recruited citizens of many countries, including but not limited to the United States, to come to Syria and join ISIS. Because of the importance of foreign fighters to ISIS's operations, ISIS has committed significant resources to recruitment of foreign fighters, in particular but not limited to those with ties to the United States. ISIS's recruitment efforts rely heavily on the use of the Internet, including web-distributed recruitment videos, to motivate foreign fighters to come to Syria (or to carry out ISIS's objectives in other ways, such as by conducting attacks on targets of opportunity in their home nations). Those videos typically depict ISIS fighters marching, training, and fighting; they urge others to either travel to Syria or Iraq, to join ISIS, or to carry out ISIS's objectives elsewhere.

B. The Defendants Conspire and Attempt to Provide Material Support to ISIS

Defendant Rakhmatov agreed with codefendant Abror Habibov to collect money to aid Saidakhmetov's travel to Syria to join ISIS. Rakhmatov agreed to collect a minimum of $1,500, and to do so by February 25, 2015, the date of Saidakhmetov's travel from JFK Airport. On February 17, 2015, Rakhmatov made a $100 contribution for this

6

purpose by peer-to-peer transfer to a bank account belonging to a codefendant, Akmal Zakirov. During a telephone call on February 24, 2015—i.e., the eve of Saidakhmetov's scheduled departure—Rakhmatov discussed with Habibov raising at least $2,000 so that Saidakhmetov could purchase a "pencil"—a coded word meaning firearm. Later that same day, Rakhmatov transferred $400 into Zakirov's bank account via peer-to-peer transfer.

Saidakhmetov went to JFK Airport on February 25, 2015, in order to board his flight to Turkey. Defendant Kasimov met Saidakhmetov at JFK Airport prior to his scheduled departure and provided him with $1,600 in cash, funds that he had raised with other co-conspirators, including but not limited to Habibov.

Saidakhmetov was arrested shortly after receiving the cash from Kasimov; the $1,600 was recovered pursuant to his arrest.

Following Saidakhmetov's arrest at JFK Airport, Kasimov was detained on immigration charges and agreed to speak with agents, waived his Miranda rights, and made inculpatory statements. In sum and substance, Kasimov admitted delivering the money to Saidakhmetov and stated his belief that Saidakhmetov "might" be traveling to Syria to join ISIS. Further investigation revealed that, in electronic communications, Kasimov encouraged others to participate in violent jihad, and otherwise acknowledged his role in providing assistance to foreign fighters traveling to Syria. For example, Kasimov wrote to one person contemplating a religious education that "those pious ones are going to Gaza, Syria, or at least, to Iraq," and that "[e]ducation is not given a priority when jihad is fard-ayn [obligatory]." Later, Kasimov explained: "A pious man . . . will get the [religious] education here and take off for jihad!" In another communication, in response to another individual's prayer for "Allah [to] help all the Muslims in the world get victory over their oppressors,"

7

Kasimov implored: "And may Allah help young guys who bought tickets too :)) [smiley-face emoticon]."

Rakhmatov was arrested on May 11, 2016. Following his arrest, he made a voluntary, unsolicited statement to the arresting agents, admitting that he provided money to someone who then used it for a "bad purpose," but claiming not to know what the money was going to be used for.

## II.   LEGAL FRAMEWORK

The Second Circuit has repeatedly upheld the use of anonymous juries where (1) there is strong reason to believe that the jury needs protection, and (2) reasonable precautions have been taken to minimize any adverse effect on the jurors' opinion of the defendants. See, e.g., Kaziu, 559 F. App'x at 37-38; United States v. Arillotta, 529 F. App'x 81, 82 (2d Cir. 2013); Ibrahim, 529 F. App'x at 65; Kadir, 718 F.3d at 120-21. "Within these parameters, the decision whether or not to utilize an anonymous jury is left to the district court's discretion." United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012) (quoting United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006)).

"In determining whether there is a 'strong reason' to believe that the jury needs protection, courts should consider several factors, including whether (1) the charges against the defendants are serious, (2) there is a substantial potential threat of corruption to the judicial process, and (3) considerable media coverage of the trial is anticipated." Al Fawwaz, 57 F. Supp. 3d at 309 (citing United States v. Quinones, 511 F.3d 289, 296 (2d Cir. 2007), and United States v. Tomero, 486 F. Supp. 2d 320, 322 (S.D.N.Y.2007)); see also Pugh, 2015 WL 8481877, at *2 (same). While "it is unclear whether any of these factors individually justify impaneling an anonymous jury," "there are numerous cases indicating

that anonymity is appropriate when some combination of these factors is present." Pugh, 2015 WL 8481877, at * 2 (quoting United States v. Khan, 591 F. Supp. 2d 166, 169 (E.D.N.Y. 2008) (citing Quinones, 511 F.3d at 296)).

Although empaneling an anonymous jury presents "the possibility of unfair prejudice to the defendant," United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989), "the use of an anonymous jury does not infringe a defendant's constitutional rights, so long as the court conducts a voir dire designed to uncover any bias as to the issues or the defendants and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities," United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995). See also Kadir, 718 F.3d at 120. "The Second Circuit has consistently 'made clear that when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights.'" Pugh, 2015 WL 8481877, at *2 (quoting Kadir, 718 F.3d at 120).

In United States v. Barnes, the Second Circuit upheld the empaneling of an anonymous jury and specifically rejected any claim that the law requires jurors to disclose their identities:

> If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If the anonymous juror feels less pressure as a result of anonymity . . . this is as it should be a factor contributing to his impartiality.

604 F.2d 121, 140-41 (2d Cir. 1979) (noting further that "in a case that generated as much pretrial publicity as [this one] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities.").

Similarly, in United States v.Thomas, the Second Circuit explained that the protection of jurors is vital to the proper functioning of the federal criminal justice system, describing jury anonymity as a mechanism to ensure a fair and impartial verdict, free from fear or intimidation:

> As a practical matter, we cannot expect jurors to "take their chances" on what might happen to them as a result of a guilty verdict. Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict. Justice requires that when a serious threat to juror safety reasonably is found to exist, precautionary measures must be taken.

757 F.2d 1359, 1364 (2d Cir. 1998).

The decision to partially sequester a jury follows the same basic framework as the decision to seat an anonymous jury, and courts in the Second Circuit have frequently seated anonymous and partially sequestered juries. See, e.g., United States v. Wilson, 493 F. Supp. 2d 397, 399-401 (E.D.N.Y. 2006) (seating anonymous and partially sequestered jury in case involving murder of police officers due to, inter alia, seriousness of charges, defendant's membership in a criminal enterprise, defendant's history of attempts to interfere with judicial process, and the significant press coverage of the case); United States v. Urso, No. 03-CR-1382, 2006 WL 1210886 at *1-2 (E.D.N.Y. May 2, 2006) (approving same where "allegations and evidence point to a willingness to interfere with the judicial process."); al Farekh, No. 15 CR 268 (BMC), ECF No. 102 (E.D.N.Y. June 16, 2017) (approving same where defendant was alleged to be a member of al-Qaeda, where charges were seriousness, there was a likelihood that jurors may be afraid of retaliation from the defendant or associates, and where a family member of the defendant had previously made efforts to speak with jurors).

10

### III. AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY IS APPROPRIATE IN THIS CASE

As noted above, the key factors in determining whether a jury should be anonymous and partially sequestered are (1) the seriousness of the charges against the defendants; (2) the potential threat of corruption of the judicial process; and (3) the expectation of publicity. See, e.g., Quinones, 511 F.3d at 296. As described below, these factors favor empaneling an anonymous jury in this case.

#### A. The Charges In This Case Are Serious

The defendants face serious charges. They are accused of conspiring to support ISIS, a terrorist organization that has claimed responsibility for vicious, violent attacks in numerous countries, including within the United States. If convicted at trial, both defendants will face an effective range under the United States Sentencing Guidelines of 360 to 480 months imprisonment on the terrorism charges. (Defendant Rakhmatov will face an additional mandatory minimum 60 months on the firearms charge).

Courts in this district have regularly approved anonymous and partially sequestered juries in cases involving similarly serious charges. See, n.1, supra. Indeed, the charges at issue in this case carry higher penalties than those charged in one recent terrorism-related cases in this District in which an anonymous jury was used. See, e.g., Pugh, 2015 WL 8481877 (anonymous and partially sequestered jury authorized in case in which the defendant was charged with one count of attempted material support of terrorism and one count of obstruction of justice).

11

B.     The Judicial Process Is At Risk

In addition to the seriousness of the charges facing the defendant, an anonymous and partially sequestered jury is also warranted because of the risk of interference with the judicial process. As noted above, the defendants are accused of aiding others in traveling to Syria to join and fight on behalf of ISIS. Many jurors will be aware of ISIS's global campaign of violence. ISIS has claimed responsibility—and/or the perpetrator(s) have claimed to be acting on behalf of ISIS—for several attacks in the United States, including: the Inland Regional Center shooting attack in San Bernardino, California, in December 2015; the Pulse nightclub shooting attack in Orlando, Florida, in June 2016; and the West Side Highway truck attack in New York City in October 2017. ISIS has also claimed responsibility for numerous attacks in Europe, Africa and Asia, including as recently as Easter Sunday 2019, in a coordinated series of bombings in Sri Lanka that killed or wounded more than 700 people. Despite the degradation of ISIS's geographical control of territory in Syria and Iraq, most jurors will know or believe that ISIS remains operational and committed to violently attacking U.S. and other Western interests.

As the Second Circuit has stated, "even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict." Thomas, 757 F.2d at 1364. There is a legitimate concern in this case that jurors may fear that an associate of the defendants—accused to be supporters of ISIS—or a member of another Islamist extremist group will target them. It would not be unreasonable for jurors to believe that disclosure of their identities or information about their families or workplaces may expose them to unnecessarily heightened risk. See Stewart, 590 F.3d at 125 (noting "the reasonable

likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety").

      C.      <u>Publicity Surrounding the Case Has Been Extensive</u>

An anonymous and partially sequestered jury is also warranted because of the extensive media attention this case has already generated and the publicity likely to result from trial. Major newspapers, wire services and television news networks have reported regarding this case, in particular concerning court proceedings involving the other codefendants. Due to the widespread public attention in this case to date, the government expects that the pretrial proceedings and trial will attract substantial media coverage.

Given the level of media attention and public scrutiny that this case already has generated, it is reasonably foreseeable that the trial, including the jurors' identities, may be the subject of media coverage. It is also conceivable that individuals sympathetic to the defendants (or the cause they support) or hostile to the government may seek to obtain information about the jurors.

The Second Circuit has repeatedly held that the expectation of publicity at trial weighs in favor of anonymity to avoid the jurors' exposure "to inappropriate contacts that could compromise the trial." See <u>United States v. Paccione</u>, 949 F.2d 1183, 1193 (2d Cir. 1991); <u>see also</u> <u>United States v. Thai</u>, 29 F.3d 785, 801 (2d Cir. 1994); <u>United States v. Vario</u>, 943 F.2d 236, 240 (2d Cir. 1991); <u>Tutino</u>, 883 F.2d at 1132; <u>United States v. Persico</u>, 832 F.2d 705, 717 (2d Cir. 1987); <u>Barnes</u>, 604 F.2d at 141. Juror anonymity is an effective remedial measure to prevent possible prejudice and inappropriate contact by the press.

Moreover, potential jurors will be more willing to serve if they are confident that they and their families will not be subjected to scrutiny, harassment and possible threats.

13

See Barnes, 604 F.2d at 141 (upholding anonymous jury and explaining that in a case with "much pretrial publicity" and "allegations of dangerous and unscrupulous conduct," "precaution was best taken so that fears would not become realities"). The media's interest in this case clearly "militate[s] in favor of an anonymous jury." Vario, 943 F.2d at 240.

IV. AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY WILL NOT PREJUDICE THE DEFENDANTS

The defendants will not be prejudiced by the use of an anonymous and partially sequestered jury. As noted above, the use of an anonymous jury does not infringe on a defendant's rights provided that (1) "the jurors [are given] a plausible and nonprejudicial reason for not disclosing their identities"; and (2) "the court conducts a voir dire designed to uncover any bias as to the issues or the defendants." Aulicino, 44 F.3d at 1116; see also Kadir, 718 F.3d at 120. The same holds true for partial sequestration. See, e.g., Pugh, 2015 WL 8481877, at *13 ("The court is convinced that semi-sequestration is the only way to adequately protect the jury," citing "the violent nature of the crimes charged and of ISI[S] more generally, and the likelihood of significant press attention to the case.").

Here, the jurors may accurately be informed that these protective measures are being taken due to anticipated media interest, to prevent any arguable inference that the defendants pose a danger to them. See Gotti, 459 F.3d at 345 (upholding use of anonymous jury and finding that prejudice was avoided by "instructing the jury that the special precautions had been implement to protect them from the media"); see also Thai, 29 F.3d at 801 ("In order to provide a nonprejudicial reason for maintaining anonymity, the introduction to the [jury] questionnaire stated, with approval of the parties, that '[s]electing an anonymous jury is not an unusual practice and has been followed in many cases in the

14

Federal Court. Anonymity will ward off curiosity that might infringe on juror's privacy[.]'"); Paccione, 949 F.2d at 1193 (upholding anonymous jury and finding that the court "adequately instructed the jury at the outset of the trial that the special precautions were designed to protect the jury from contacts by the media, thereby implying that the security measures were not the result of threats from the defendants"); Tutino, 883 F.2d at 1133 (upholding anonymous jury procedure where the jury was instructed that "It is a common practice followed in many cases in Federal court to keep the names and identities of the jurors in confidence. This is in no way unusual."); see also Kaziu, 559 F. App'x at 38 ("the district court told jurors that their identities were being hidden only because of the extensive media coverage and did not implicate Kaziu's dangerousness"). Thus, in keeping with Second Circuit precedent, the Court can eliminate any potential prejudice to the defendants by issuing an instruction informing the jury in a neutral manner that anonymity is necessary to protect them from the media, and that selection of anonymous juries is not an unusual procedure.

Furthermore, the use of an anonymous jury does not conflict with either defendant's right to conduct meaningful voir dire. See Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981). As the Second Circuit explained in Barnes:

> [A]s long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal.

604 F.2d at 140. The trial court has substantial discretion in controlling and limiting the voir dire process. See Rosales-Lopez, 451 U.S. at 189; Barnes, 604 F.2d at 137. Accordingly, a full voir dire may be conducted about subjects other than the juror's name, address and

15

employer's name, and the parties and counsel have an unrestricted opportunity to observe the jurors during this process. See, e.g., Barnes, 604 at 142-43.

In the anonymous jury context, the Second Circuit has frequently noted that a defendant's rights are protected by the district court's conduct of "a voir dire designed to uncover bias as to issues in the cases and as to the defendant[s]." Vario, 943 F.2d at 242 (quoting Barnes, 604 F.2d at 140); see also Thai, 29 F.3d at 801.

Accordingly, under the circumstances presented, empaneling an anonymous and partially sequestered jury will not prejudice the defendants.

V.    CONCLUSION

        For the reasons set forth above, the government respectfully requests that the Court grant the government's motion for an anonymous jury, and direct that the names, addresses and workplaces of members of both the <u>venire</u> and the <u>petit</u> jury not be revealed to the parties. The government further respectfully requests that the jurors be kept together during recesses and taken to or provided lunch as a group each day during trial; and that they be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service.

Dated: Brooklyn, New York
       August 2, 2019

                                      Respectfully submitted,

                                      RICHARD P. DONOGHUE
                                      United States Attorney
                                      Eastern District of New York

                        By:    /s/ J. Matthew Haggans
                                      Douglas M. Pravda
                                      David K. Kessler
                                      J. Matthew Haggans
                                      Assistant United States Attorneys
                                      (718) 254-6268/7202/6127

cc:    Clerk of Court (WFK) (via ECF)
        Defense Counsel (via ECF)