

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

AAS:DMP/DKK/JMH                    *271 Cadman Plaza East*
F. #2014R01413                     *Brooklyn, New York 11201*

October 16, 2020

<u>By ECF</u>

The Honorable William F. Kuntz, II
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

       Re:   United States v. Azizjon Rakhmatov
               <u>Criminal Docket No. 15-95 (WFK)</u>

Dear Judge Kuntz:

The government respectfully submits this sentencing memorandum in advance of the sentencing of defendant Azizjon Rakhmatov ("Rakhmatov" or "the defendant"), currently scheduled for Tuesday, December 15, 2020, at 10:30 a.m. This memorandum also sets forth the government's response to the defendant's objections to the Pre-Sentence Investigation Report ("PSR"), which are contained in the defendant's memorandum filed on September 1, 2020 (ECF No. 463) ("Def. Mem."). For the reasons articulated below, the government submits that the appropriate sentence in this case is 15 years' imprisonment, which is both the the the statutory maximum sentence for the offense of conviction and the advisory Guidelines sentence pursuant to the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G.").

## I.    <u>Background</u>

### A.  <u>The Islamic State of Iraq and al-Sham ("ISIS")</u>

As the Court is aware, ISIS is a foreign terrorist organization that, since 2013, has claimed credit for numerous terrorist activities, including multiple attacks against Americans in the United States and attacks against civilian populations in numerous other countries including but not limited to Syria, Iraq, France, Germany, the United Kingdom, Sri Lanka, and elsewhere.

In particular, during the August 2014 to February 2015 time period, ISIS committed high-profile attacks in which ISIS executed multiple American and other Western hostages, including two American journalists in brutal beheadings.  In August 2014, ISIS murdered James Foley by decapitation, purportedly in retaliation for American airstrikes in Iraq.  In September 2014, ISIS murdered Steven Sotloff by decapitation.  Two individuals charged with their decapitations have recently been extradited to the United States and are being prosecuted for their murders.  These were high-profile, grisly executions that were videotaped and broadcast around the world.[1]

On September 10, 2014, President Barack Obama outlined in an address to the nation the United States' strategy to, along with coalition partners, "degrade and ultimately destroy" ISIS, which the president identified  as "a terrorist organization, pure and simple" with "no vision other than the slaughter of all who stand in its way."  During his address, the President detailed ISIS's history of extreme violence and its threat not just to the region but to the United States, noting that ISIS terrorists "are unique in their brutality" and "executed captured prisoners . . . kill children . . . enslave, rape and force women into marriage" and "in acts of barbarism, they took the lives of two American journalists, Jim Foley and Steven Sotloff."  On September 22, 2014, in response to, inter alia, ISIS's violent attacks, including the beheading of two U.S. citizens, and ISIS's territorial gains and widespread terrorist violence and the threat it posed to U.S. interests inside and outside the Middle East, United States military forces and those of its coalition partners launched direct combat operations against ISIS in Syria, beginning with a series of airstrikes against ISIS targets.

In addition to these attacks, ISIS has sought to establish an Islamic State or "caliphate," and at various times over the past few years, has controlled territory in Syria and Iraq.  On June 29, 2014, ISIS released an audio recording declaring a "caliphate" consisting of territory under ISIS control in Iraq and Syria, and stating that Abu Bakr al-Baghdadi would be the "caliph" or "leader for Muslims everywhere."  On July 5, 2014, ISIS released a video recording in which Baghdadi urged Muslims from across the world to "do jihad in the cause of God, incite the believers and be patient in the face of this hardship."

At all times relevant to this case, ISIS was designated by the Secretary of State as a foreign terrorist organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224.  (See generally PSR ¶¶ 3-6).

---

[1] Similarly, in January 2015, ISIS released a video showing its murder of a Jordanian Air Force pilot, whom it burned to death in a cage after capturing him.  The video provoked widespread outrage and condemnation of ISIS around the world.

### B.  The Offense Conduct

Beginning in 2014, the government began to investigate a group of individuals based in Brooklyn and elsewhere in the United States who either planned to travel to Syria to join ISIS or financed the travel of other individuals to Syria to join ISIS.  The defendant, a citizen of Uzbekistan, was part of that network.  As described below, Rakhmatov contributed money to that network for a period of several years, and in February 2015, contributed money for a specific traveler, co-defendant Akhror Saidakhmetov, to travel to Syria to join and fight with ISIS.

### 1.  Rakhmatov Contributed Money to a Financial Network That Sent Fighters to Join ISIS and Supported the Families of ISIS Fighters

The government's investigation revealed that Rakhmatov, co-defendants Abror Habibov and Akmal Zakirov, and others were part of an extensive financial support network that raised money for, among other things, financing travel to Syria by individuals wishing to join and fight on behalf of ISIS.  That network's participants referred to it as "chayxona," an Uzbek word which translates to the "tea house" or "tea party."

The group began raising money in approximately 2012, seeking contributions of $20 or $50 from its participants every two weeks.  In addition to financing travel to Syria by individuals wishing to join and fight on behalf of ISIS, the group also raised money to help support the families that the fighters left behind when they went to Syria and to help support the widows and families of those who were killed fighting for ISIS.  (See Kasimov Trial Tr., dated Sept. 19, 2019, at 405-06).[2]

As Rakhmatov stipulated in his plea agreement, for several years prior to February 2015, Rakhmatov gave and collected money to support fighters in Syria, their families, and widows of men killed in battle in Syria.  Rakhmatov also discussed with other individuals the idea of going to Syria.  (See Plea Agreement ¶ 3(f)).[3]

Over time, different members of the group were responsible for collecting the "tea party" contributions from the participants in the group.  As of February 2015, when the group collected money for Saidakhmetov's travel, Zakirov was the individual responsible for collecting the money from other members of the "tea party."

---

[2] The transcript is from testimony at the trial of Rakhmatov's co-defendant Dilkhayot Kasimov.

[3] The parties stipulated to certain facts about Rakhmatov's conduct, and those stipulations are set forth in paragraph 3 of the plea agreement.

### 2. In February 2015, Rakhmatov Contributed Funds for Saidakhmetov to Travel to Fight on Behalf of ISIS and to Purchase a Firearm

The government's investigation also identified two individuals – Saidakhmetov and co-defendant Abdurasul Juraboev – who expressed their belief in ISIS's terrorist agenda, including the establishment by force of an Islamic caliphate in Iraq and Syria, and spent months planning their travel to Syria to engage in violence on behalf of ISIS. (PSR ¶¶ 7-8). Saidakhmetov and Juraboev were in direct contact with ISIS representatives about engaging in violent jihad and about how to travel to join ISIS in Syria by transiting through Turkey. (PSR ¶¶ 10-11).

In December 2014, Juraboev purchased an airplane ticket to travel from John F. Kennedy International Airport ("JFK Airport") in Queens, New York to Istanbul, Turkey, departing on March 29, 2015. (PSR ¶ 14). Saidakhmetov, however, did not have money to pay for an airplane ticket to travel to Syria to join ISIS. Saidakhmetov turned for financial assistance to Habibov, who agreed to raise money for Saidakhmetov's airplane ticket and expenses.

In early February 2015, Habibov discussed with Rakhmatov that Saidakhmetov was going to Syria to fight for ISIS and that Habibov was contributing money to fund Saidakhmetov's travel.[4] Rakhmatov agreed to collect money from others, and, as discussed below, ultimately contributed his own money to fund Saidakhmetov's travel to Syria to fight with ISIS. (PSR ¶ 19, Plea Agreement ¶ 3(b)). Thereafter, Habibov continued to speak with other members of the financial support network to raise money for Saidahmetov's travel.

On February 17, 2015, Rakhmatov transferred $100 into Zakirov's bank account via a peer-to-peer transfer, according to bank records.

On February 19, 2015, Habibov and Zakirov spoke about sharing the cost of Saidakhmetov's ticket and raising an additional amount of money to give to Saidakhmetov for his travels. Habibov asked Zakirov how much they should give Saidakhmetov. Zakirov responded that they should give as much as needed. Habibov suggested giving $4,000, and having Habibov and Zakirov share the cost of the plane ticket and raising the remaining amount from other individuals. Habibov stated that he had spoken to Rakhmatov, who had responded, "Depending on how much is needed, I will try to my best to add as well." (PSR ¶ 21).

---

[4] Although Rakhmatov objects to paragraph 20 of the PSR (which the government addresses in more detail below), he does not dispute the contents set forth herein in the text. (See Def. Mem., Ex. 18 (Sageman Report) at 3).

4

A few minutes after Habibov talked to Zakirov, Habibov called Rakhmatov. In the conversation, Habibov stated that the reason he was calling was to remind Rakhmatov of Saidakhmetov's departure on February 25, 2015. Habibov stated that he and Zakirov were buying Saidakhmetov's plane ticket. Habibov stated that he did not know what expenses Saidakhmetov would face in Syria and that they needed to collect money for Saidakhmetov. Rakhmatov responded as follows:

> RAKHMATOV: Wait, he is not going there for fun. He will join them. Once he joins, I think . . . . they pay them over there, brother.

> HABIBOV: Even so. They are saying they have their own things when they join. What's that called . . . . Apparently, they go there with their own toys [referring to guns].

> RAKHMATOV: Okay, I get it, but they have it or not, people are still going there. It's not an issue. As long as they reach there. There are many people there.

In this portion of the conversation, when Rakhmatov stated that Saidakhmetov "was not going there for fun" but instead would "join them," Habibov understood Rakhmatov to mean that Saidakhmetov was going to Syria to fight for ISIS. (Kasimov Trial Tr., dated Sept. 18, 2019, at 304). Rakhmatov also noted that Saidakhmetov would be paid for fighting for ISIS. Habibov's use of the word "toys" was a reference to an AK-47 automatic weapon. (Id. at 305). Rakhmatov also noted that many other people were also traveling to Syria to join ISIS. (PSR ¶ 21).

Later in the same conversation, Habibov asked Rakhmatov to give as much as he could and to collect money from others. Rakhmatov agreed with Habibov's request to collect money for Saidakhmetov's travel. Habibov suggested that Rakhmatov collect at least $1,500 and up to $2,000. Rakhmatov agreed, saying "Let me ask around. We will try as much as we can." Rakhmatov also stated, "I will let you know the total collected. I will let you know in a couple of days. God willing." Rakhmatov also agreed to try to collect the money by February 25, 2015, the date of Saidakhmetov's travel. (PSR ¶ 21).

Later that same day, Habibov and Saidakhmetov went to a travel agency on Coney Island Avenue in Brooklyn, New York, and purchased an airplane ticket for Saidakhmetov to travel from JFK Airport to Istanbul, Turkey, departing on February 25, 2015. (PSR ¶¶ 17, 21).

In the evening of February 23, 2015, Habibov texted Rakhmatov and asked "Brother, what's going on with that thing? A brother is leaving tomorrow." Habibov was referring to Saidakhmetov. (PSR ¶ 22).

Several hours later, also in the evening of February 23, 2015, Rakmatov called Habibov.  Habibov stated that Saidakhmetov "will be leaving tomorrow evening" and that Habibov had already bought Saidakhmetov's ticket, which cost $570.  (PSR ¶ 22).

Rakhmatov responded that Saidakhmetov should have at least $1,000, and Habibov replied that Saidakhmetov should have at least $2,000.  Rakhmatov asked why.  Habibov responded that it would cost Saidakmetov at least $1,000 for a "pencil," referring to a firearm, and that Saidakhmetov should have $1000 more for other expenses.[5]

> HABIBOV: They [ISIS] could give the pencil [firearm] themselves, but I—
>
> RAKHMATOV: Uh-huh.
>
> HABIBOV: I am saying that we need to contribute our part to it, I mean, to [the purchase of] his pencil [firearm].
>
> RAKHMATOV: Hmm, I got it, got it.
>
> HABIBOV: Are you getting it? In case if that were to come here, right, hopefully he won't end up departing—
>
> RAKHMATOV: Please be more accurate [cautious], I got you brother, l got you.
>
> HABIBOV: Sure, sure.
>
> RAKHMATOV: I understood brother.  [Pause]  Hmm. . . .
>
> HABIBOV: I want to contribute . . . um . . . contribute specifically to his pencil [firearm], you know; I am saying to contribute.
>
> RAKHMATOV: Good, brother. Now . . . 200 . . . there is 200 in cash.
>
> HABIBOV: Uh-huh?
>
> RAKHMATOV: Um . . . recently I have been speaking to [unintelligible] . . . um . . . that . . . um . . . frequently . . . there are some guys who have been falling asleep and missing the last 2-3 Friday prayers [i.e., not contributing money], you know.

---

[5] Habibov used the word "pencil" to refer to a weapon.  (Kasimov Trial Tr., dated Sept. 18, 2019, at 317-18).  In his plea agreement, Rakhmatov stipulated that the reference to "pencil" in this conversation referred to a firearm.  (See Plea Agreement ¶ 3(d)).

HABIBOV: Uh-huh?

RAKHMATOV: They are falling asleep [even] for regular ones [i.e., not making the bi-monthy contributions]. So, I will try to drag it again. However, there are 200 in cash.

HABIBOV: Um . . . or should we deposit it once he reaches Turkey, but how?

RAKHMATOV: Um . . . please don't talk too much now, brother.

HABIBOV: Uh, okay, okay.

RAKHMATOV: Then I will do this. I will find out how much total and transfer to Akmal's [referring to Zakirov] account online, okay?

HABIBOV: Sure, brother. Good.

RAKHMATOV: We'll do so then. We'll do it that way. Is it ok?

HABIBOV: It does, it does, brother. May Allah [unintelligible]

RAKHMATOV: In that case for now 200 . . . 200 . . . if there is more added then I will let [you] know how much is sent. It'll be transferred to Akmal [Zakirov]. God willing.

When Habibov stated to Rakhmatov that he wanted to contribute to the cost of Saidakhmetov's firearm, Rakhmatov responded by saying that "there is 200 in cash." Rakhmatov then said he would try to raise money from others and find out "how much total" he could raise. Specifcally, Rakhmatov stated that he would transfer $200 to Zakirov's bank account online, but would contribute more "if there is more added." (PSR ¶ 22).

During the same conversation, when Habibov asked Rakhmatov whether they should deposit the money for Saidakhmetov once Saidakhmetov reached Turkey, Rakhmatov responded "please don't talk too much now, brother." Habibov understood Rakhmatov to mean that Habibov should not talk about the details of Saidakhmetov's trip on the phone. (Kasimov Trial Tr., dated Sept. 18, 2019, at 318).

On February 24, 2015, following the telephone call set forth above, Rakhmatov transferred $400 into Zakirov's bank account via peer-to-peer transfer. As Rakhmatov stipulated in his plea agreement, Rakhmatov transferred that money intending to fund Saidakhmetov's travel to and expenses in Syria to fight on behalf of ISIS. (Plea Agreement ¶ 3(e), PSR ¶ 22).

Several other individuals also contributed money to support Saidakhmetov's travel. In addition to buying the plane ticket, the group raised an additional $1600, which Kasimov delivered to Saidakhmetov at JFK Airport shortly before Saidakhmetov was scheduled to depart on his flight to Istanbul, Turkey. (PSR ¶ 23).

On February 25, 2015, shortly after midnight, Saidakhmetov was arrested at JFK Airport on the jetway as he attempted to board his flight to Turkey on his journey to join ISIS. The $1600 that the support network had raised for him – including the money from Rakhmatov – was recovered from Saidakhmetov's person. Others involved, including Habibov, Zakirov and Juraboev were either arrested or detained on immigration charges on February 25, 2015. (PSR ¶ 24). Rakhmatov was subsequently arrested on May 11, 2016. (PSR ¶ 25).

## C. Procedural History

On May 9, 2016, a grand jury in the Eastern District of New York returned a superseding indictment charging Rakhmatov with one count of conspiracy and one count of attempt to provide material support to ISIS, both in violation of 18 U.S.C. § 2339B, and with one count of conspiracy to use a firearm, in violation of 18 U.S.C. § 924(o).

On August 15, 2019, Rakhmatov pleaded guilty before Your Honor to one count of conspiracy to provide material support to ISIS, in violation of 18 U.S.C. § 2339B. (PSR ¶ 1). In his plea allocution, Rakhmatov stated, "I gave money that I knew would be used to send someone to fight with ISIS terrorist group in Syria," and admitted that he had conspired with others to provide material support to ISIS. (Aug. 15, 2019 Tr. at 44).

## D. The Government's Response to Rakhmatov's Factual Objections to the PSR

Rakhmatov raises several objections to facts set forth in the PSR. (See Def. Mem. at 13-14).[6] First, Rakhmatov "denies that he had the conversation alleged by Mr, Habibov in paragraph 20" of the PSR. (See id. at 13 ¶ A). Paragraph 20 states as follows:

In early February 2015, Rakhmatov traveled from his home in Connecticut to Brooklyn, where he met with Habibov. During that meeting, Rakhmatov asked Habibov, "what was going on with the guy who wanted to travel," referring to Saidakhmetov. Habibov said that Saidakhmetov was planning to fly to Turkey. Rakhmatov told Habibov that he could put Saidakhmetov in

---

[6] In addition to these factual objections, Rakhmatov also raises several legal objections to the application of the Sentencing Guidelines, which the government addresses below.

8

touch with another individual involved in their group who was in Turkey at that time and with whom Rakhmatov was in contact. However, Habibov never followed up with Rakhmatov about putting Saidakhmetov in contact with that individual.

(PSR ¶ 20). Rakhmatov's blanket denial is imprecise. For instance, following the release of the PSR, the government provided defense counsel – in response to his request – with a recorded conversation between Rakhmatov and Habibov showing that Rakhmatov had come to Brooklyn and planned to meet with Habibov in person on February 6, 2015. Moreover, Rakhmatov admitted in conversations with a defense "expert" identified as a "psychiatrist and terrorism expert" (Def. Mem. at 22) that he traveled to Brooklyn in early February 2015 to drop off his aunt and met with Habibov during that visit. (See Def. Mem., Ex. 18 (Sageman Report) at 2).

Rakhmatov also admitted that, during that same time frame, he discussed Saidakhmetov's planned travel to join ISIS with Habibov, although Rakhmatov recalled that the conversation happening during a phone call rather than in person. Specifically, Rakhmatov conceded that, "[d]uring another phone conversation, Habibov asked Mr. Rakhmatov to raise money for a young Uzbek (Akhror Saidakhmetov), who wanted to join 'Daulat' (the Islamic State in Arabic)." Ultimately, "Mr. Rakhmatov agreed to give money for the traveler to Syria." (See Def. Mem., Ex. 18 (Sageman Report) at 3).[7] Because Rakhmatov concedes the essential facts set forth in paragraph 20 of the PSR, his objection can be only to the portion of the conversation describing his offer to put Saidakhmetov in contact with another person who could help him upon his arrival in Turkey. As that fact is not material to Rakhmatov's sentencing, the government will not pursue it at a <u>Fatico</u> hearing.

Rakhmatov also objects to the PSR's characterization of him as an "ISIS support and sympathizer" and that he conspired to "fight in a violent jihad." (See Def. Mem. at 13 ¶ B). Those are appropriate conclusions to be drawn from the undisputed facts presented in the PSR.

---

[7] Rakhmatov believes that this conversation happened via telephone because he recalls giving a bath to his newborn daughter while speaking to Habibov. (See Def. Mem., Ex. 18, at 3 n.3). The February 23, 2015 call features a baby screaming in the background for portions of the call. It is likely that Rakhmatov is confusing this call with the in-person meeting in early February 2015. Indeed, because the government is not in possession of any call discussing "Dualat," and because Rakhmatov and his co-conspirators were extremely careful not to reference "Dualat" or the Islamic State over the telephone, it is likely that the conversation took place during Rakhmatov's in-person meeting with Habibov in Brooklyn on February 6, 2015. In any event, the undisputed fact that Habibov and Rakhmatov discussed raising money for Saidakhmetov's travel, not the format of that conversation, is what is relevant for purposes of sentencing.

The government expresses no view on Rakhmatov's remaining factual objections set forth in paragraphs C, D, E and F on pages 13-14 of the Defendant's Memorandum, as none of the claims set forth in those paragraphs are within the government's knowledge.

## II.   The Sentencing Scheme and the Guidelines Calculation

Rakhmatov pleaded guilty to a violation of 18 U.S.C. § 2339B, which – as applicable here – carries a sentencing range of up to 15 years' imprisonment.[8]

As set forth below, the Guidelines calculation yields an advisory Guidelines sentence of 15 years (180 months) imprisonment, which is the statutory maximum for the offense.  Rakhmatov objects to two of the applicable enhancements, which objections the government addresses below.

### A.   The Guidelines Calculation

The PSR's total offense level of 37 is premised upon a base offense level of 26 (U.S.S.G. 2M5.3(a)), a two-level enhancement because the offense involved the provision of material support or resources to a foreign terrorist organization with the intent, knowledge or reason to believe that the support or resources were to be used to commit or assist in the commission of a violent act (U.S.S.G. 2M5.3(b)(1)(E)), a 12-level enhancement because the offense involved or was intended to promote a federal crime of terrorism (U.S.S.G. 3A1.4) (the "Terrorism Enhancement"), and a three-level reduction for acceptance of responsibility.  The defendant's Criminal History category is VI based on the application of the Terrorism Enhancement.  With a total offense level of 37 and a Criminal History category of VI, the resulting Guidelines range is 360 months to life.  However, because the statutory maximum sentence is 180 months, the effective Guidelines range is 180 months' imprisonment.

Notably, however, although Rakhmatov technically accepted responsibility for his actions by pleading guilty to conspiring to provide material support to ISIS, certain aspects of his sentencing memorandum call into question whether he should be awarded any reduction for acceptance of responsibility.  Specifically, Rakhmatov stated in his sentencing memorandum that he gave money to Habibov to pay off a debt that he owed to Habibov. (Def. Mem. at 26-27).  This statement – in addition to being contrary to the evidence that the government would have presented at trial, inconsistent with Rakhmatov's allocution that he conspired to provide material support to ISIS, and contrary to Rakhmatov's stipulation in the plea agreement that Rakhmatov gave that money "intending to fund Saidakhmetov's travel to

---

[8] After the offense conduct was completed, Congress amended Title 18, United States Code, Section 2339B to increase the statutory maximum sentence to 20 years.  At the time of the offense, however, the statutory maximum sentence was 15 years.

and expenses in Syria to fight on behalf of ISIS" (Plea Agreement ¶ 3(e)) – is incompatible with acceptance of responsibility.[9]  Nevertheless, because of the 180 month statutory maximum sentence, the denial of credit for acceptance of responsibility would have no effect on the overall Guidelines range.

## B.  The Government's Response to Rakhmatov's Objections to the PSR's Guidelines Calculation

Rakhmatov raises two principal objections to the PSR's calculation of the Guidelines range.  First, he objects to the application of the Terrorism Enhancement.  Second, to the extent the Court nevertheless applies the Terrorism Enhancement, he objects on the grounds of "double counting" to the application of the two-level increase for an offense involving the provision of material support or resources to a foreign terrorist organization with the intent, knowledge or reason to believe that the support or resources were to be used to commit or assist in the commission of a violent act.  The Court should overrule these objections for the reasons set forth below.

### 1.  The Terrorism Enhancement Applies to Rakhmatov's Conduct

The Terrorism Enhancement is set forth in Section 3A1.4 of the Guidelines.  Under that provision, "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," the Court is to add 12 levels to a defendant's offense level and to increase the defendant's criminal history category to category VI.  An offense "involves" a federal crime of terrorism where the offense itself meets the definition of "federal crime of terrorism," and an offense is "intended to promote" such a crime "when the offense is intended to help bring about, encourage, or contribute to a federal crime of terrorism." United States v. Awan, 607 F.3d 306, 314 (2d Cir. 2010).

The application notes to Section 3A1.4 give the term "federal crime of terrorism" the same meaning as set forth in 18 U.S.C. § 2332b(g)(5).  Section 2332b(g)(5) defines a "federal crime of terrorism" as (a) a crime that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," and (b) constitutes a violation of one or more of a list of enumerated federal statutes.  See 18 U.S.C. § 2332b(g)(5).  Section 2339B is one of these enumerated crimes.  Thus, as applicable here, a "federal crime of terrorism" is a violation of 18 U.S.C. § 2339B

---

[9] After the defendant sought a delay in sentencing in part to investigate whether Rakhmatov's purported attempt to purchase an iPhone from Habibov for $400 for resale provided evidence of his mixed motives in contributing $400 for Saidakhmetov's travel (see ECF No. 452 at 2), the government advised that it viewed defense efforts to provide an alternative explanation for the $400 donation that was contrary to the stipulation in the plea agreement as inconsistent with and potentially a breach of the agreement (see ECF No. 455 at 1-2).

that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." U.S.S.G. § 3A1.4(a).

Determing whether an offense is "calculated to influence or affect" does "not require proof of a defendant's particular motive." Awan, 607 F.3d at 317 (Terrorism Enhancement applied where defendant "knew that the objective" of the FTO was to "influence the Indian government through violence" and "knew that the money he provided . . . would be used toward that end," even if defendant "may not have been personally motivated by that objective"); accord, e.g., United States v. Mohamed, 757 F.3d 757, 760 (8th Cir. 2014) ("motive is simply not relevant"). Instead, the definition requires only that an offense be "calculated, i.e., planned-for whatever reason or motive-to achieve the stated object." Awan, 607 F.3d at 316 ("a person who murders a head of state, for instance, sure in the knowledge that his crime will influence or affect the conduct of government, satisfies the terms of § 2332b(g)(5)(A) even if his particular *motivation* in committing the murder is to impress a more established terrorist with his abilities").

The government bears the burden of proving the application of the Terrorism Enhancement by a preponderance of the evidence. See, e.g., United States v. Norris, 281 F.3d 357, 359 (2d Cir. 2002); see also Awan, 607 F.3d at 312 (when finding facts relevant to sentencing for Guidelines calculation purposes, a district court is "required to use the preponderance of the evidence standard").

The evidence set forth in the PSR and the stipulations in the Plea Agreement show by a preponderance of the evidence that Rakhmatov's conduct warrants application of the Terrorism Enhancement. There is no dispute that Rakhmatov provided financial support to Saidakhmetov to travel to Syria to fight on behalf of ISIS, that Rakhmatov discussed with Habibov the need to raise money for Saidakhmetov to purchase a firearm, and that Rakhmatov subsequently gave money intending to fund Saidakhmetov's travel to and expenses in Syria to fight on behalf of ISIS. Rakhmatov's offense of conviction therefore "involved" a "federal crime of terrorism" because the conspiracy to provide material support to ISIS in violation of Section 2339B was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."

ISIS's principal objective was to establish a new state in Syria and Iraq; the principal tactics by which ISIS sought to achieve that objective included acts of terror and "incomprehensible human rights violations." (PSR ¶¶ 3, 6). ISIS's efforts to establish a caliphate in Iraq and Syria were well known and widely publicized by ISIS itself. The goal of the conspiracy to which Rakhmatov pleaded guilty was to provide a fighter to participate in ISIS's activities, necessarily supporting the creation of that state.[10] See, e.g., United States

_____

[10] Moreover, even Rakhmatov's offense could somehow be construed as not itself "involving" a "federal crime of terrorism, it was certainly "intended to promote a federal

12

v. Chandia, 675 F.3d 329, 340 (4th Cir. 2012) (although knowledge of an organization's "terrorist purpose" is insufficient for application of Terrorism Enhancement, reasonable inference that defendant "intended to advance that purpose" was sufficient).

Moreover, even if the only goal of the conspiracy was to fight the Assad regime, as Rakhmatov insists, fighting to overthrow the Assad regime in Syria is conduct intended to "influence or affect" that government through coercive force—as opposed to, say, political lobbying—and to retaliate against the government's conduct for attacks on opposition forces. See United States v. Mohamed, 757 F.3d 757, 760 (8th Cir. 2014) (Terrorism Enhancement applied where defendant agreed that he had "assisted men . . . with traveling to Somalia, so that the men could fight against Ethiopian troops who were in Somalia assisting the internationally-recognized Transitional Federal Government"); United States v. Ali, 799 F.3d 1008, 1031–32 (8th Cir. 2015) (Terrorism Enhancement applied where defendants provided funds to al Shabaab and demonstrated "their vocal support of al Shabaab's efforts to expel the [Transitional Federal Government] by force").

For these reasons, the Terrorism Enhancement appropriately applies to Rakhmatov's offense of conviction.

### 2. The Court Should Reject Rakhmatov's Objection To the Application of the Terrorism Enhancement

The thrust of Rakhmatov's objection to the application of the Terrorism Enhancement is that supporting ISIS with the intent to combat or overthrow the Assad regime in Syria is not the kind of conduct contemplated by the Terrorism Enhancement. Because Rakhmatov's motives are irrelevant to the question whether the Terrorism Enhancement applies, the Court should overrule his objection.

First, Rakhmatov argues that the Terrorism Enhancement should not apply because the facts do not show his "specific intent . . . involved . . . calculating to influence [or] affect the conduct of the government" or his "general intent or hope that the Bashir al Assad government be opposed . . . was the 'specific intent' to commit a specific act of terrorist crime." (Def. Mem. at 5.) But a defendant's motive is not relevant in determining the applicability of the Terrorism Enhancement. Awan, 607 F.3d at 317. Instead, the only question is whether the provision of a fighter to travel to Syria to fight for ISIS, including against the Assad government, was "planned-for whatever reason or motive" to influence that government or retaliate against government conduct. Awan, 607 F.3d at 316. As explained above, the offense in this case was so planned. Rakhmatov's motive for committing the offense of conviction—even if humanitarian—is legally irrelevant for purposes of the guidelines.

---

crime of terrorism," namely Saidakhmetov's provision of himself as a fighter for ISIS in Syria.

None of the cases cited by Rakhmatov in support of his argument involve a situation in which a district court declined to apply the Terrorism Enhancement to a defendant who pleaded guilty to providing material support to ISIS where the government offered specific facts to support that enhancement. See United States v. Stewart, 590 F.3d 93, 138 (2d Cir. 2009) (Terrorism Enhancement did not apply where government conceded that it had "failed to show that the defendant's offenses were calculated to influence or affect the conduct of government by intimidation or coercion or to retaliate against government action"); Chandia, 514 F.3d at 376 (Terrorism Enhancement was improperly applied because "the PSR did not contain any factual assertions and the district court did not make any factual findings related to the intent element" of the enhancement); United States v. Sihai Cheng, 2016 WL 413077, at *1 (D. Mass. Feb. 1, 2016), aff'd sub nom. United States v. Sihai Cheng, 849 F.3d 516 (1st Cir. 2017) (Terrorism Enhancement did not apply where defendant pleaded guilty to export control violations arising from his role in "an illicit scheme to export highly sensitive goods with nuclear applications, called pressure transducers, from the United States to Iran through China"); United States v. Shehadeh, No. 10-CR-1020 (ENV), 2013 WL 6049001, at *1–2 (E.D.N.Y. Nov. 14, 2013) (defendant was convicted of lying to FBI agents; the Court rejected application of the Terrorism Enhancement premised on defendant's additional lies to an Army recruiter about his reasons for joining the Army).

Rakhmatov also relies on United States v. Jumaev, No. 12-CR-00033-JLK, 2018 WL 3490886, at *6 (D. Colo. July 18, 2018), in which the defendant gave approximately $300 to the Islamic Jihad Union ("IJU"), a foreign terrorist organization that was at the time largely obsolete. The district court declined to apply the Terrorism Enhancement in Jumaev because the district court found the defendant "had no specific plot or plan and did not intend to further any via his contribution," id. at *1. In this case, however, Rakhmatov has stipulated to the purposes of his provision of funds—to support a fighter traveling to Syria to fight for ISIS. [11]

Second, Rakhmatov argues that the Terrorism Enhancement should not apply to his offense because the "Assad regime is not a 'government,' within the terms and meaning of the statute." (Def. Mem. at 7.)

As an initial matter, and contrary to the defendant's assertion that the Terrorism Enhancement is designed to protect only American victims, it is well-settled that the term "government" in the definition of "federal crime of terrorism" encompasses foreign

---

[11] Moreover, the Court should dismiss the defendant's frivolous assertion that ISIS did not commit any terrorist attacks during the period of the conspiracy. (Def. Mem. at 6). As set forth above, ISIS committed numerous terrorist attacks before and during the period of the conspiracy, including the high-profile decapitations of two U.S. citizens and journalists, leading President Obama to declare ISIS a terrorist organization and launch airstrikes on ISIS and its territory in Syria and Iraq.

governments.  United States v. Khan, 938 F.3d 713, 718 (5th Cir. 2019) (enhancement applies to "conduct intended to influence a foreign government"); United States v. Assi, 428 F. App'x 570, 574 (6th Cir. 2011) (collecting cases where enhancement was applied to crimes involving the governments of Colombia, Egypt, Pakistan, and Israel).  The Assad regime in Syria was plainly a foreign government.

The conduct of the Assad regime—no matter how reprehensible—is not the issue for the narrow purpose of determining whether the enhancement applies.  The Assad government was a government for purposes of the statute; indeed, its designation as a "state sponsor of terrorism" (see Def. Mem. at 7) shows that the Assad regime remains a "state." Moreover, Congress did not "intend for a United States district court judge to determine whether a foreign state is complying in full with its international obligations before determining whether" that foreign state qualifies as a "government" for purposes of Section 3A1.4.  See Assi, 428 F. App'x at 574 (rejecting the relevance of defense argument that Israel did not qualify as a "government" based upon evidence that "Israel was acting illegally by continuing to occupy Lebanon" in violation of a U.N. Security Council Resolution).[12] Neither the text of the Terrorism Enhancement nor anything in the Guidelines supports Rakhmatov's argument that the Terrorism Enhancement applies only to crimes against foreign governments about whose legitimacy the United States has not expressed doubt.  Put another way, the Guidelines do not absolve individuals who support terrorist organizations for the purpose of directing international vigilante violence against a disfavored foreign government.

Third, Rakhmatov contends that his own actions were "non-violent."  (Def. Mem. at 6.)  The evidence shows otherwise.  The provision of a jihadist to fight in Syria, armed with a rifle, under ISIS's direction and control is not a "non-violent" offense; indeed, ISIS's goals and methods are inherently violent.  But, even if Rakhmatov's conduct could be

---

[12] The government is aware of one case in which a defendant argued (unsuccessfully) that the Terrorism Enhancement should not apply because, although he planned to travel to Iraq and join ISIS and encouraged another to do so, he asserted that "he only intended to fight against the forces supporting Assad and to influence the Assad regime" and "the United States had ceased to recognize the legitimacy of the government led by Assad as the Syrian government and had instead recognized the Syrian National Opposition Coalition as the legitimate representatives of the Syrian people."  United States v. Khan, 938 F.3d 713, 718–19 (5th Cir. 2019).  The Fifth Circuit held that it "need not resolve" that issue related to the Assad regime because the defendant had planned to travel to Iraq to join ISIS, and had encouraged and funded another individual to join and fight for ISIS, regardless of whether in Iraq or Syria.  Id.  The court also stated that, "[i]n any event, ISIS is an enemy of the United States. Supporting ISIS, including by encouraging [the other individual] to join ISIS and funding [him] in that mission, is some evidence that [the defendant's] conduct was calculated to influence or affect the conduct of the United States because ISIS's terrorist acts are intended to intimidate or coerce the United States."  Id.

deemed "non-violent," that would be irrelevant, because the Terrorism Enhancement applies to "non-violent" acts as well as "violent" ones.  There are "only two elements that must be met in order for an offense to be a federal crime of terrorism, and neither of those elements requires an act to be violent."  <u>Assi</u>, 428 F. App'x at 574.

Fourth, Rakhmatov argues that this Court should exercise discretion not to apply the Terrorism Enhancement because application would be "unfair, unfounded, or unsupported."  (Def. Mem. at 10.)  Although this Court has discretion not to apply the enhancement, <u>United States v. Mason</u>, 410 F. App'x 881, 887 (6th Cir. 2010) (district court did not err in applying terrorism Terrorism Enhancement where "the PSR and the indictment contained sufficient allegations to support the terrorism adjustment" and court was "aware of its discretion" not to apply the enhancement but "chose" to do so), Rakhmatov's argument is better considered as an argument in mitigation for a below-Guidelines sentence, which argument the government will address in its analysis of the sentencing factors under 18 U.S.C. § 3553(a).

For all these reasons, the Probation Department properly concluded that the Terrorism Enhancement applies to Rakhmatov's conduct.  The Court should likewise apply the Terrorism Enhancement in determining Rakhmatov's proper Guidelines range.

### 3. The Court Should Reject Rakhmatov's Objection That the Guidelines Calculation Includes Impermissible Double-Counting

Rakhmatov argues that the application of both the Terrorism Enhancement and an enhancement pursuant to Section 2M5.3(b)(1)(E) for knowledge that the material support was being provided "to commit or assist in the commission of a violent act" constitutes impermissible "double counting."  (Def. Mem. at 11.)

Section 2M5.3(b)(1) applies where "the offense involved the provision of (A) dangerous weapons; (B) firearms; (C) explosives; (D) funds with the intent, knowledge, or reason to believe such funds would be used to purchase any of the items described in subdivisions (A) through (C); or (E) funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act."  The PSR appropriately applies the enhancement based on subsection (b)(1)(E).  (PSR ¶ 34).  The enhancement is also applicable under subsection (b)(1)(B)—the "offense involved the provision of . . . firearms"—because Rakhmatov provided funds in part to purchase a "pencil," meaning a firearm, for Saidakhmetov to use in Syria.  (PSR ¶ 22).

Rakhmatov's objection that this enhancement constitutes impermissible double-counting where the Terrorism Enhancement also applies is contrary to law.  The Second Circuit has rejected the argument that the application of both the Terrorism Enhancement and the 2M5.3(b)(1) enhancement constitutes "double counting."  <u>United</u>

16

States v. Banol-Ramos, 516 F. App'x 43, 47–48 (2d Cir. 2013).  The Circuit explained that "multiple adjustments may properly be imposed when they aim at different harms emanating from the same conduct."  Id.  Here, the Terrorism Enhancement is targeted at the purpose of the conduct—to address governmental action, rather than private action—and the 2M5.3(b)(1) enhancement is targeted at what "material support" was provided (jihadist fighters, firearms or other items to help conduct a violent attack).  As a result, application of both enhancements does not result in impermissible "double counting."

Rakhmatov also argues that this enhancement should also not apply, even if the Court does not apply the Terrorism Enhancement, because Saidakhmetov's possession of a weapon does not consistute a "crime of violence" under Section 16(b) and because Rakhmatov's money contribution was not a violent act.  It cannot reasonably be disputed that giving money for Saidakhmetov to purchase a rifle and giving money to send a fighter to ISIS that Rakhmatov knew would be armed with a rifle fall within the scope of the Guidelines enhancement.  Sending an armed fighter into a conflict zone to serve a violent FTO is a violent act, and the Guidelines enhancement refers to a "violent act," not the the "crime of violence" language that has been the subject of recent jurisprudence, and in any event, the Supreme Court has held that the use of "crime of violence" language elsewhere in the Guidelines is not unconstitutionally vague.  See Beckles v. United States, 137 S. Ct. 886 (2017).  Further, the Guidelines enhancement does not require that a defendant's act be violent, rather, it requires that "funds . . . be given with the intent, knowledge, or reason to believe" that they would be used to commit or assist in the commission of a violent act, a test that is amply satisfied here.

## III.   Argument

### A.  The Court Should Sentence the Defendant to 180 Months' Imprisonment

In addition to the range recommended by the Guidelines, 18 U.S.C. § 3553(a) requires the Court to consider a number of factors in imposing sentence, including (among others) the nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)); the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide a just punishment for the offense (§ 3553(a)(2)(A)); and the need for the sentence to afford adequate deterrence to criminal conduct (§ 3553(a)(2)(B)) and to protect the public from further crimes of the defendant (§ 3553(a)(2)(C)).

In this case, the sentence imposed should reflect the seriousness of the defendant's conduct, deter the defendant specifically from committing further crimes, deter others from providing funding to those who would travel to join ISIS or another foreign terrorist organization, and promote respect for the law.  These factors all counsel in favor of a Guidelines sentence.

The conduct is undeniably serious. Rakhmatov provided money in order to cover another person's travel and expenses to travel to Syria to join and fight with ISIS, which he knew to be a terrorist organization. As discussed below, Rakhmatov's conversations with Habibov show Rakhmatov's knowledge of what it meant to travel to Syria to fight with ISIS. Rakhmatov agreed to collect money from others as well as to give money himself. Rakhmatov and Habibov specifically discussed that part of the funding would be used to pay for Saidakhmetov's firearm. Rakhmatov gave money knowing that it would be used in part to fund the purchase of that firearm. In short, Rakhmatov's crime involved giving money to send a fighter whom he knew would have a firearm to fight on behalf of a terrorist organization.

The summary above of Rakhmatov's conversations with Habibov reflect that Rakhmatov was well-versed in what it meant to travel to Syria to join and fight on behalf of ISIS. During the February 19, 2015 conversation, when Habibov discussed the need to collect money for Saidakhmetov's expenses, Rakhmatov stated that ISIS paid its fighters. When Habibov expressed concern that Saidakhmetov would be at a disadvantage if he did not arrive with a firearm or have money for a firearm, Rakhmatov stressed the fundamental important of Saidakhmetov's arrival in Syria ("It's not an issue" [whether he has a gun] "[a]s long as they reach there.") Rakhmatov made clear that he understood fully Saidakhmetov's purpose in traveling when he stated that Saidakhmetov "was not going there for fun." These conversations showed that Saidakhmetov's travel was not something that was being raised for the first time with Rakhmatov or that he did not have any prior knowledge or understanding regarding funding travelers to join ISIS in Syria.

In addition, Rakhmatov did not just give money, but told Habibov that he would try to raise money from others. As Rakhmatov stipulated in his plea agreement, he "agreed to collect money and contributed money to fund Saidakhmetov's travel to Syria to fight with ISIS." (Plea Agreement ¶ 3(b)). Thus, when Rakhmatov and Habibov spoke about the necessary level of contribution, Rakhmatov said that some of the people from whom he had been collecting had missed their last two to three donations and that he would try again to collect from them.

The conversations between Rakhmatov and Habibov showed that Rakhmatov was engaged specifically in giving and raising money for Saidakhmetov's firearm in addition to his travel and other expenses. When Habibov stated to Rakhmatov in the February 23, 2015 conversation that Habibov specifically wanted to contribute to the cost of Saidakhmetov's firearm, Rakhmatov responded by saying that "there is [already] 200 in cash." Rakhmatov then said he would try to raise money from others and find out "how much total" he could raise. Rakhmatov's $400 contribution on February 24, 2015 followed that conversation about raising money for Saidakhmetov's firearm.

Rakhmatov also showed that he knew his conversations related to illegal activity through his use of coded phrases during these conversations. He and Habibov never mentioned Saidakhmetov's name (referring to Saidakhmetov only as "the brother" and "he"),

never stated the place Saidakhmetov was going (stating "there" and "over there" rather than Syria), never mentioned the terrorist organization that Saidakhmetov was joining (stating that he was "joining them" rather than ISIS or the Islamic State), and used code words to refer to a firearm (calling them "toys" and a "pencil"). Never once during these conversations did Rakhmatov express any confusion about the cryptic language that was being used or suggest that he did not understand what was happening.

Indeed, whenever Habibov came too close to providing specific details on the phone, it was Rakhmatov who scolded him and told him to be more careful. For instance, during the February 23, 2015 conversation, when Habibov said they needed to contribute to the purchase of the "pencil," he asked whether Rakhmatov was "getting it" and started to elaborate. Rakhmatov interrupted, saying, "Please me more accurate [meaning cautious], I got you brother, I got you." Later during the same conversation, Habibov mentioned "Turkey" and asked "should we deposit it once he reaches Turkey," leading Rakhmatov to scold Habibov for being too specific. Rakhmatov directed Habibov, "[P]lease don't talk too much now, brother."

As the government described earlier, at the time that Rakhmatov gave money and agreed to collect money to fund Saidakhmetov's travel to join ISIS, it was common knowledge that ISIS's principal objective was to establish a new state in Syria and Iraq and that ISIS used terrorism and other violent acts to accomplish that objective. Thus, the offense was unquestionably serious, and Rakhmatov's role in the offense was significant.

Therefore, a Guidelines sentence of 180 months' imprisonment is appropriate to reflect the seriousness of Rakhmatov's conduct, to provide just punishment and to promote respect for the law. It is also appropriate to deter Rakhmatov and others from providing funding to those who would travel to join ISIS or another foreign terrorist organization.

Indeed, the Guidelines themselves show that a sentence of 180 months' imprisonment is appropriate for deterrence purposes, by enhancing the defendant's criminal history category by 12 levels for a crime of terrorism and by placing the defendant in Criminal History Category VI. As the Second Circuit has explained, "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." United States v. Meskini, 319 F.3d 88, 92 (2d Cir. 2003). The Court continued, "even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." Id. The Second Circuit recently reaffirmed that:

> The Guidelines, while only advisory, appropriately reflect Congress's considered judgment that terrorism is different from other crimes. "[T]errorism represents a particularly grave threat

19

> because of the dangerousness of the crime and the difficulty of
> deterring and rehabilitating the criminal."

United States v. Mumuni, 946 F.3d 97, 112-13 (2d Cir. 2019) (internal quotation marks and citation omitted).  A sentence at the statutory maximum and the Guidelines range is appropriate not merely given the seriousness of the crime and to provide just punishment for the offense but also to meet the deterrence goals of Section 3553.

## B.  The Court Should Reject the Defendant's Downward Departure Requests

Rakhmatov argues that the Court should grant two downward depatures:  One on the basis that Criminal History Category VI (which applies by virtue of the applicaton of the Terrorism Enhancement) overrepresents his criminal history, and one on the basis that his conduct in this case is aberrant.  The Court should reject both of these.

### 1.  Criminal History Category VI Does Not Overstate
### The Seriousness of the Defendant's History

Rakhmatov argues that Criminal History Category VI overrepresents the seriousness of his criminal history because he has no criminal record, his offense did not involve violence and he contributed a small amount of money.  (Def. Mem. at 14).

Under Guidelines Section 4A1.3(b), a sentencing court may grant a downward departure if "reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." U.S.S.G. § 4A1.3(b).  The Guidelines themselves contemplate that this departure will be granted only in "limited circumstances."  Id. comment.

As an initial matter, even if the Court were to grant a horizontal departure to reduce Rakhmatov's Criminal History Category from VI to I, Rakhmatov would still face a Guidelines range of 210 to 262 months' imprisonment (based on a total offense level of 37), which is still in excess of the statutory maximum sentence for his offense of conviction.

Nevertheless, no such departure is warranted here.  The Second Circuit has made clear enhancing a defendant's criminal history category to VI is appropriate in terrorism cases:

> Congress and the Sentencing Commission had a rational basis for
> creating a uniform criminal history category [VI] for all terrorists
> under § 3A1.4(b), because even terrorists with no prior criminal
> behavior are unique among criminals in the likelihood of
> recidivism, the difficulty of rehabilitation, and the need for
> incapacitation. . . .

Meskini, 319 F.3d at 92 (emphasis added).  Contrary to Rakhmatov's argument, merely because he has no prior criminal record does not mean that placing him in Criminal History Category VI overrepresents the seriousness of his criminal history or the likelihood that he will recidivate.  Meskini makes clear that Congress has indicated its legislative intent through Section 3A1.4 to enhance a defendant's criminal history because terrorism offenses are more difficult to deter.  Id. at 92.  Thus, numerous courts have rejected horizontal departures in a defendant's criminal history category where a defendant with no prior criminal record was placed in Criminal History Category VI by operation of the Terrorism Enhancement.  See, e.g., United States v. El-Hage, 589 Fed. Appx. 29, 31 n.2 (2d Cir. 2015) (finding no procedural error in district court placing defendant in criminal history category VI despite the defendant having no prior criminal convictions); Banol-Ramos, 516 Fed. Appx. at 46-47 (no error district court's refusal to grant a downward departure because Terrorism Enhancement elevated criminal history category to VI); United States v. Hammoud, 483 Fed. Appx. 865, 873 (4th Cir. 2012) (affirming district court decision declining to modify criminal history category based on argument that it overrepresented the seriousness of defendant's criminal history because he had no prior criminal convictions); United States v. Lindh, 227 F. Supp. 2d 565, 571 (E.D. Va. 2002) ("Although the defendant has no prior criminal record, he is appropriately categorized in Criminal History Category VI, rather than I, pursuant to USSG § 3A1.4.").

Furthermore, the Second Circuit has specifically held that any departures from the criminal history category in a terrorism case should be made only in "exceptional cases." Specifically, the Second Circuit articulated

> Considering the serious dangers posed by all forms of terrorism, the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases.

Meskini, 319 F.3d at 92.  This is not an "exceptional case."  Although Rakhmatov continues to argue that there was no violence inherent in his conduct, he ignores that paying to send a fighter with a firearm to join a deadly terrorist organization committing violent acts was inevitably going to lead to violence against U.S. interests and potentially U.S. persons. ISIS's principal objective during this time period was to establish a new state in Syria and Iraq, and it endeavored to do so through force and violence and, indeed, terrorism.

Although Rakhmatov cites his supposedly law-abiding conduct before and after his February 2015 contributions to Saidakhmetov's travel and firearm as support for his argument that Criminal History Category VI overrepresents his criminal history, he ignores certain critical facts.  First, his pre-February 2015 conduct included – as he stipulated in his plea agreement – that "[f]or several years prior to February 2015, Rakhmatov gave and collected money to support fighters in Syria, their families, and widows of men killed in battle," and even discussed with several individuals the idea of going to Syria to fight.  (Plea Agreement ¶ 3(f)).  Moreover, his apparent lack of criminal conduct from March 2015

through his arrest a year later is hardly redeeming given that several of his co-conspirators had been arrested, the FBI was investigating other members of the "tea party," and the "tea party" was therefore no longer involved in sending fighters to Syria.

For these reasons, Rakhmatov does not represent the "exceptional case" that warrants a downward departure from Criminal History Category VI.

Notably, the cases on which Rakhmatov relies for the proposition that the Court shoud grant a downward departure in fact imposed substantial sentences on defendants for their terrorism crimes.  See United States v. Alhaggagi, 372 F.Supp.3d 1005, 1013-14 (N.D. Cal. 2019) (applying terrorism enhancement but downwardly departing from a Criminal History Category VI to I based on the district court's wholesale disagreement with the notion that a defendant's offense of conviction should be used to enhance his criminal history category, yet still sentencing the defendant to 188 months' imprisonment); United States v. Muhtorov, 329 F. Supp. 3d 1289, 1311 (D. Colo. 2018) (sentencing defendant to 132 months' imprisonment notwithstanding downward departure from Criminal History Category VI to II); United States v. Nayyar, No. 09-CR-1037, 2013 WL 2436564 (S.D.N.Y. June 5, 2013) (sentencing defendant to 15 years' imprisonment notwithstanding grant of unspecified downward departure from application of Terrorism Enhancement).[13]

## 2.  A Departure for Aberrant Behavior Is Not Warranted

Rakhmatov's request for a downward departure on the basis of "aberrant behavior" suffers from a key flaw – his conduct was not "aberrant."  Under the applicable policy statement, the Court may (but is not required to) depart downward where a defendant committed only a single criminal transaction that was committed without significant planning, that was of limited duration, and that represents a marked deviation from an otherwise law-abiding life.  U.S.S.G. § 5K2.20.

Here, Rakhmatov's conduct was not limited to a single transaction nor was it of limited duration.  While Rakhmatov pleaded guilty to conspiring to provide material support to ISIS by providing Saidakhmetov as personnel, Rakhmatov stipulated in his plea agreement that for several years prior to Saidakhmetov's efforts to travel, Rakhmatov gave and collected money to support fighters in Syria, their families, and widows of men killed in

---

[13] Rakhmatov also cites Jumaev in support of his request for a downward departure, but Jumaev did not involve a downward departure from the Terrorism Enhancement.  Rather, as set forth above, the district court chose not to apply the Terrorism Enhancement at all because it found that the defendant gave $300 for a terrorist organization (the Islamic Jihad Union) that was obsolete at the time, and that the money went to an individual who did not know how to send the money to the terrorist organization and whose wife used the money to pay family expenses.  The court nevertheless imposed a time-served sentence of approximately 76 months' custody.  See Jumaev, 2018 WL 3490886 at *2, 5-6, 21.

battle.  (Plea Agreement ¶ 3(f)).  Thus, Rakhmatov had a long-standing practice of giving money to, among other things, support fighters in Syria.  His behavior in giving money to Saidakhmetov to travel to Syria and fight on behalf of ISIS was consistent with this long-standing practice and therefore was not a single transaction, was not of limited duration and was not committed without significant planning.

Therefore, it was not aberrant behavior that warrants a departure from the Guidelines.  In any event, even if the Court were to conclude that the defendant's behavior was aberrant, the Court should decline to grant a downward departure on this basis for the same reasons that a 180-month sentence is appropriate.

### C.  The Court Should Reject the Defendant's Request for a Sentence Within the Range of 63 to 78 Months' Imprisonment

The Court should reject Rakhmatov's arguments for a sentence within the range of 63 to 78 months' imprisonment, which he states represents the Guidelines range based on a base offense level of 26 and without the application of any of the enhancements set forth in the PSR.  (Def. Mem. at 41).  The government addresses each of Rakhmatov's arguments in support of such a lenient sentence below.

First, Rakhmatov argues that he never supported violence against the United States and that his financial support for Saidakhmetov to join ISIS was premised on his opposition to the Assad regime in Syria.  (Def. Mem. at 19-23).  Rakhmatov spends pages of his sentencing submission documenting the atrocities committed by the Assad regime.  Even crediting Rakhmatov's claim that his motivation was, in fact, to support those fighting against Assad, the manner in which he went about doing that does not entitle him to leniency. Rakhmatov sought to deploy a jihadist to fight in Syria, armed with a rifle, under ISIS's direction and control.  He did so knowing, as he allocuted in his guilty plea, that ISIS was a terrorist organization.  This is an inherently violent offense, and one that he committed at a time when ISIS had directed attacks in Syria against Americans, including beheading American journalists, and at a time when the United States was conducting attacks on ISIS. Rakhmatov had plenty of lawful ways that he could have expressed his disagreement with the Assad regime, but instead he chose to further the violence in Syria, including violence directed at the United States, by contributing material support to ISIS.

Rakhmatov cannot sever ISIS's opposition to the Assad regime from ISIS's other violent terrorist attacks directed at the United States and at many other governments and civilian populations.  ISIS's gruesome murders of U.S. civilians in the late summer of 2014 were not directed at the Assad regime.  Nor were any of ISIS's other attacks against U.S. interests here or overseas.  Rakhmatov could not have prevented ISIS from deploying Saidakhmetov in any fashion ISIS chose, whether against the Assad regime or any other. This undermines any premise that Rakhmatov's material support to ISIS was somehow benign, or less malignant, because of Rakhmatov's claimed anti-Assad motive.

23

Moroever, the fact that Saidakhmetov was arrested before he could travel to Syria to join and fight on behalf of ISIS does not warrant leniency at sentencing for Rakhmatov.  As the Second Circuit recently held, "[W]hen it comes to sentencing terrorism, Congress and the United States Sentencing Commission 'plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences.'"  Mumuni, 946 F.3d at 113.

Second, Rakhmatov argues throughout his sentencing submission that his contribution of $400 was intended to repay Habibov for iPhones that he had ordered from Habibov for $400.  (E.g., Def. Mem. at 22, 26).  That argument should immediately be rejected because it violates the stipulation in Rakhmatov's plea agreement that Rakhmatov gave that money "intending to fund Saidakhmetov's travel to and expenses in Syria to fight on behalf of ISIS."  (Plea Agreement ¶ 3(e)).

Rakhmatov's argument also is contrary to the facts.  Rakhmatov contends that the purported $400 debt Rakhmatov owed Habibov is supported by a February 7, 2015 call in which Rakhmatov ordered two iPhones from Habibov for $400.  In fact, the call does not support Rakhmatov's argument.  In the call, Habibov was not proposing to sell iPhones to Rakhmatov.  Rather, Habibov was reaching out on Rakhmatov's behalf to a third person who was selling iPhones.  The call does not support that Rakhmatov ever purchased any iPhones, let alone that he did so from Habibov and therefore owed Habibov a debt.  Moreover, the call does not support that the amount of any debt would have been $400.  On the contrary, Rakhmatov stated on the call that if he could buy iPhones, he would buy two for $400 each, for a total of $800.

A subsequent conversation confirms that Rakhmatov never purchased any iPhones, much less from Habibov, and therefore did not owe a $400 debt to Habibov.  On February 15, 2015, Habibov told Rakhmatov that he had told the seller of the iPhones that Rakhmatov wanted to buy an iPhone 6 and was ready to pay $400 in cash but the seller had already committed to selling the iPhone 6 to someone else.  Habibov asked if Rakhmatov would be interested in the iPhone 5S instead.  Rakhmatov said that he was not, because he already had an iPhone 5, which he intended to send to his mother, and was looking for an iPhone 6 for himself.  Habibov said he would discuss this with the seller again.  There was no other conversation between Habibov and Rakhmatov about purchasing an iPhone before Rakhmatov contributed the money for Saidakhmetov's travel.

These conversations about iPhones (and similar references to Rakhmatov's desire to purchase an iPad and a Macbook in the same conversation) did not pertain to the money Rakhmatov contributed to fund Saidakhmetov's travel.  That is evidenced by multiple facts, including that Rakhmatov in fact gave more than $400 to Zakirov—$100 on February 17, 2015, and then $400 on February 24, 2015, for a total of $500.  As noted above, Zakirov was the designated "tea party" collector in February 2015.  Moreover, when Rakhmatov and Habibov discussed how much money Rakhmatov could contribute, he never once told

24

Habibov he would give $400 nor did he reference any amount that he might owe Habibov, much less $400 for an iPhone, when they spoke. Rather, Rakhmatov told Habibov multiple times in the February 23, 2015 call that he had $200 to contribute and he would ask around for more. If in fact Rakhmatov were paying Habibov back for a $400 iPhone purchase, one would expect that Rakhmatov would have told Habibov that he was giving $400 and that he was doing so as payment for the iPhone. None of those things ever happened.

In short, Rakhmatov's claim that he gave $400 to support Saidakhmetov's travel because he owed a debt in that amount to Habibov based on the purchase of iPhones is not supported by the record.[14]

Third, Rakhmatov argues that sentences in a collection of other cases warrant a sentence below 15 years in this case. (Def. Mem. at 32-36). For example, he cites cases in which defendants gave money to a terrorist organization, but ignores that there is a distinction between giving money and providing a fighter to a terrorist organization. Thus, in Jumaev, for instance, the district court pointedly noted that the government had not established what the defendant intended to happen with the $300 that he contributed. Jumaev, 2018 WL 3490886, at *6. Here, in contrast, Rakhmatov was aware that his contribution would support the sending of a fighter, armed with a rifle, to support ISIS's terrorist cause.

Some other cases on which the defendant relies are not comparable to his. For example, Rakhmatov relies heavily on Judge Brodie's sentence of 18 months' imprisonment in United States v. Rabbani, No. 15-CR-302 (E.D.N.Y.). However, Rakhmatov overlooks significant distinctions, most notably that Rabbani was a juvenile, that he was convicted of conspiring to impede federal officers (Rakhmatov incorrectly states that Rabbani was convicted of a material support offense), that Judge Brodie found that Rabbani lacked the intent to attack federal officers with the knife in his possession, and that Rabbani faced a maximum sentence of five years and a Guidelines range of 30-37 months' imprisonment.

Other cases Rakhmatov cites involved defendants who cooperated wth the government and therefore those sentences are not applicable comparisons. See, e.g., United States v. John Doe, No. 14-CR-612 (E.D.N.Y.) (Judge Weinstein's two year sentence reflected the defendant's extraordinary cooperation with the government, which included meeting with and discouraging other similarly situated individuals who were interested in traveling to Syria to join and fight with ISIS); United States v. Conley, 14-CR-163

_____

[14] The Court should reject Rakhmatov's effort to introduce "facts" about his conduct through the "expert reports" of Adeeb Khalid and Marc Sageman. While there are certain subject areas in which an expert can offer expertise, neither Khalid nor Sageman have any specialized knowledge that permit them to conclude that Rakhmatov's contribution of $400 was made to pay off a debt owed to Habibov for iPhones. It is the role of the Court – not the province of defense experts – to make factual findings in connection with sentencing.

(D. Colo.), Docket Entry 81 at 8, 33 (district judge imposed a sentence of 48 months' imprisonment because the government itself advocated such a sentence in light of the defendant's cooperation).[15]

Rakhmatov also points to a study by the Center on National Security at Fordham Law School to argue that the average sentence for ISIS-related crimes between March 2014 and June 2016 is 9.2 years.[16]  That conclusion, however, is drawn from just 14 specific ISIS cases, only eight of which involved defendants who pleaded guilty to a material support offense.  Of those eight cases, the defendants in four cases received sentences of 180 months' imprisonment (Morgan, Davis, Elfgeeh, and Saadeh); one defendant received a sentence of 144 months' imprisonment even though the government had sought a sentence of only 9 years' imprisonment (Teausant); one defendant who was 17 years old at the time of the offense received a sentence of 136 months' imprisonment (Amin); and two defendants who cooperated with the government—and therefore are not similarly situated to Rakhmatov—received sentences of 82 months' imprisonment and 48 months' imprisonment (Wolfe, Conley).

The defendants in the remaining six cases are not similarly situated because, as in Rabbani, they were not sentenced for material support charges and faced lower statutory maximum sentences.  For instance, one defendant was sentenced for a violation of 18 U.S.C. § 922(g), which carries a maximum sentence of 120 months' imprisonment, and was actually sentenced to that maximum sentence (Diaz).  Two other defendants were sentenced for making false statements in violation of 18 U.S.C. § 1001 (Coffman, Abood), and another defendant was sentenced for conspiracy in violation of 18 U.S.C. § 371 (Hodzic), which violations both carry a maximum sentence of five years.  Finally, the remaining two defendants were sentenced for misdemeanor violations of 18 U.S.C. § 111(a), which carries a statutory maximum sentence of one year, and both were sentenced to terms of probation (Said, Abdulkadir).

Moreover, the Center for National Security at Fordham Law School has continued to update its analysis of ISIS-related cases.  The most recent report, which is still current as of May 2017, showed that the average sentence is 13.3 years.  See https://static1.squarespace.com/static/5b16a000e17ba39f6f3825ba/t/5d55bbef1d607c00013a9843/1565899759960/CNS_ISIS_case_update_may2017.pdf at 1, 4 (last visited October 13, 2020).

---

[15] In some cases on which Rakhmatov relies, there is no publicly available sentencing transcript or opinion recording the basis for the district court's sentence.

[16] See https://static1.squarespace.com/static/5b16a000e17ba39f6f3825ba/t/5d55bbda5e0ed8000152e7cb/1565899739918/CNS_case_by_case_ISIS_july2016.pdf (last visited October 13, 2020).

Finally, while Rakhmatov argues that the 15-year sentences this Court imposed on his co-defendants Abdurasul Juraboev and Akhror Saidakhmetov are not comparable because their conduct is "more serious" than Rakhmatov's, he fails to recognize that Rakhmatov's conduct was intended to facilitate the gravely serious crimes that Saidakhmetov (and by extension Juraboev) intended to commit. Moreover, Saidakhmetov's attempt to join ISIS's ranks relied significantly on the crucial support network of which Rakhmatov was a participant.

Fourth, Rakhmatov argues that the Court should provide a lenient sentence because he will either be removed to Uzbekistan following his conviction or, if his petition for relief under the Convention Against Torture is granted, he will be detained indefinitely in immigration custody. (Def. Mem. at 38-39). The government disagrees that this is a basis for a lenient sentence. The government's understanding is that if Rakhmatov could not be detained indefinitely even if he could not be removed to Uzbekistan because of the prospect that he would be tortured. See, e.g., Zadvydas v. Davis, 533 U.S. 678, 701 (2001) (noting that "a statute permitting indefinite detention of an alien would raise a serious constitutional problem"). According, the prospect that Rakhmatov may be released rather than removed from the United States, if in fact he can bring a successful claim pursuant to the Convention Against Torture, warrants a longer, rather than a more lenient, sentence.

Fifth, Rakhmatov argues that he is not a threat to the public and cites Sageman's report to argue that "recidivism is extremely low for defendants convicted of terrorism." (Def. Mem. at 40). However, other studies have cast doubt on this result. For instance, a November 2019 study found higher recidivism and reengagement rates among terrorism defendants compared to criminal recidivism rates. See Mary Beth Altier, Emma Leonard Boyle & John G. Horgan (2019), "Returning to the Fight: An Empirical Analysis of Terrorist Reengagement and Recidivism," Terrorism and Political Violence, available at https://doi.org/10.1080/09546553.2019.1679781 (last visited Oct. 13, 2020) ("We find terrorist recidivism and reengagement rates are much higher in our sample than in some of the existing literature, but that they are in line with--and similar to gang members, slightly higher than criminal recidivism rates."). Moreover, the field of study of terrorism recidivism rates struggles with small sample size issues compared with criminal recidivism more generally. In any event, however, even if the empirical research does not provide a consistent answer, the Second Circuit has made clear that long sentences are warranted to deter terrorism offenders: "Congress and the Sentencing Commission had a rational basis for concluding that an act of terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists and their supporters should be incapacitated for a longer period of time." Meskini, 319 F.3d at 92.

27

## IV.    <u>Conclusion</u>

        For all these reasons, the government respectfully requests that the Court sentence the defendant to a Guidelines sentence of 180 months' imprisonment in order to provide just punishment, promote respect for the law, and provide adequate deterrence to others contemplating similar acts.

Respectfully submitted,

SETH D. DuCHARME
Acting United States Attorney

By:   <u>/s/ Douglas M. Pravda</u>
        Douglas M. Pravda
        David K. Kessler
        J. Matthew Haggans
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    Lawrence Stern, Esq., counsel for Rakhmatov (by ECF)
       Clerk of the Court (WFK) (by ECF)