UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA          :
                                  :
        -against-                 :
                                  :          15-95
JURABOEV, et. al, AZIZJON         :          WFK
RAKHMATOV,                        :
                                  :
                Defendant         :
                                  :
------------------------------------------------------x


---

DEFENDANT AZIZJON RAKHMATOV'S
REPLY TO THE GOVERNMENT'S
SENTENCE MEMORANDUM AND TO
THE PRESENTENCE REPORT
ADDENDUM 11-2-20, AND HIS MOTION
TO STRIKE BASELESS INFLAMMATORY
LANGUAGE FROM THE PSR AND
ADDENDUM

---

LAWRENCE MARK STERN, ESQ.
100 Hudson Street, #6A
New York, N,Y, 10013
(212) 925-6863
Attorney for Azizjon Rakhmatov

TABLE OF CONTENTS

Page

ARGUMENT.................................................... 1

POINT I

THERE IS NO EVIDENCE THAT MR.. RAKHMATOV
SUPPORTED ISIS GOALS OF KILLING NON-MUSLIMS
AND CREATING A NEW JIHADI STATE, NOR DID HE
JOIN A CONSPIRACY TO DO SO..................................... 1

POINT II

THE GOVERNMENT DOES NOT SHOW THAT MR.
RAKHMATOV HAD THE "SPECIFIC INTENT" TO
"CALCULATE" OR "PROMOTE" A LEGALLY
COGNIZABLE "AFFECT" ON A "GOVERNMENT"
THEREFORE THE TERRORIST ENHANCEMENT
SHOULD NOT APPLY. ........................................... 9

POINT III

THE GOVERNMENT FAILS TO DISTINGUISH THE
CASES WHERE THE COURTS DECLINED TO APPLY
THE TERRORISM ENHANCEMENT. ............................... 16

POINT IV

THE GOVERNMENT URGES THE COURT, CONTRARY
TO THE MANDATE OF 18 U.S.C. §3553(a), AND IN
RELIANCE ON ERRORS OF FACT AND INFERENCE,
TO IMPOSE THE MAXIMUM SENTENCE BASED ON
THE "NATURE OF THE OFFENSE", WITHOUT REGARD
TO ITS "CIRCUMSTANCES", "THE HISTORY AND
CHARACTERISTICS OF THE DEFENDANT" AND THE
MOST "AFFECTIVE CORRECTIONAL TREATMENT".................. 20

POINT V

MR. RAKHMATOV'S UNTREATED AND IMPROPERLY
TREATED MEDICAL AND DENTAL CONDITIONS
SHOULD BE ADDRESSED IN SENTENCING......................... 29

<u>Page</u>

<u>POINT VI</u>

MR. RAKHMATOV HAS NOT VIOLATED HIS PLEA
AGREEMENT BY EXPLAINING THE MOTIVES AND
INFLUENCES THAT LED HIM TO INTEND TO
PROVIDE MATERIAL SUPPORT TO AN FTO. . . . . . . . . . . . . . . . . . . . . . . . 31

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

ii

ARGUMENT

The government's sentence memorandum and the Presentence Report Addendum are replete with innuendo, erroneous assertions of fact, unsupported conclusions, and misinterpretations of the law. The length of this reply is necessitated accordingly.

I

THERE IS NO EVIDENCE THAT MR. RAKHMATOV SUPPORTED ISIS GOALS OF KILLING NON-MUSLIMS AND CREATING A NEW JIHADI STATE, NOR DID HE JOIN A CONSPIRACY TO DO SO

The government argues, abetted by the Probation Department's outrageous claim that he intended to kill non-Muslims, that Mr. Rakhmatov attempted to provide a "jihadi" fighter to ISIS to create a new "jihadi" state in Syria leading to violence against the United States. (Gov't. memorandum at pp. 9, 12, 15, 21, 23; PSR Addendum 11-2-20 at p. 1). These claims have no basis in fact or evidence and improperly attribute to him legal responsibility for those acts even though the offense of conviction does not include them. The PSR's inflammatory language objected to in the sentence memorandum at page 13, and the kill-non- Muslim language of the Addendum should be deleted, lest Mr. Rakhmatov be harmed in prison.[1]

---

[1] The PSR Addendum also incorrectly states Mr. Rakhmatov's wife's income as $36,000. Although her hours vary as a nursing home attendant, she makes about $1000 every two weeks.

1

Mr. Rakhmatov pled guilty to providing material support to ISIS. That conviction renders him responsible for his act of money contribution to an organization designated a Foreign Terrorist Organization (FTO) by the Attorney General. Guilt of the crime requires the knowledge and intent that the contribution go to such an organization; it does not require that all of the crimes and goals of that organization be known and intended by the defendant, "Congress plainly spoke to the necessary mental state for a violation of §2339B, and, it chose knowledge about the organization's connection to terrorism, **not specific intent to further the organization's terrorist activities**" *Holder v. Humanitarian Law Project*, 561 U.S. 1, 16 (2016)(emphasis added). According to *Holder,* and contrary to *United States v. Awan*, 607 F.3d 306 (2d Cir. 2010), decided a week before *Holder*, motive is not relevant to guilt of material support (but it is relevant to whether or not the Terrorist Enhancement should be imposed. See *infra*).

The government asserts no evidence of Mr. Rakhmatov's sympathy or support for violent "jihad" war. The money contribution conviction is his only knowing contribution to ISIS or other terrorist organization. Other contributions he made through the traditional Uzbeki cultural group of friends known as a "Choyhana" or "tea party"[2], were part of his charitable duties as a Muslim, and included giving money to fighters and their families in Syria, not knowingly to ISIS. Mr. Rakhmatov admitted in his guilty plea agreement to making pre-offense

---

[2] See the report addendum of Professor Adeeb Khalid, attached hereto, Ex. 4.

contributions to defense-fighters in Syria as described, but not contributions to ISIS or any other terrorist group. ISIS did not even exist when the government alleges that the Choyhana's contributions began.

Mr. Rakhmatov did not know Saidakhmetov, the man whose travel to which he was contributing in the offense of conviction, and there is no evidence that he knew Saidakhmetov's goals and intentions other than to fight with ISIS against the Assad regime. He also did not know Juraboev, and there is no evidence he knew about Juraboev's threats to kill the President. During Mr. Rakhmatov's telephone conversations with Habibov, Mr. Rakhmatov can be heard arguing against money for a gun, and his insufficient $400 contribution was not denominated for a gun.

The cooperating witness Habibov, during his testimony at the trial of Dilkhayot Kasimov, did not name Mr. Rakhmatov as someone who agreed with ISIS terrorist acts and broad goals to establish an Islamic state or attack the United States interests. He testified that people in the Choyhana contributed money not knowing it was going to ISIS. (Habibov testimony. Ex. 1 attached hereto at pp. 24-25, 174-75).

The government has produced no evidence of Mr. Rakhmatov's verbal or written agreement with ISIS propaganda or even his reading or viewing such propaganda, no statements by him adopting or approving of ISIS terrorist attacks and jihadist goals, and no evidence of telephone conversations of such nature.

When the government argues that Mr. Rakhmatov "cannot sever ISIS' opposition to the Assad regime from ISIS's other violent terrorist attacks directed

at the United States and at many other governments."  (Gov't. Mem. at 23), it is arguing that, regardless of Mr. Rakhmatov's specific intentions, the law does not allow for, or recognize, such a severance. *Holder, supra*, however, holds to the contrary. Mr. Rakhmatov is only responsible for the scope of the conspiracy he knowledgeably joined. *United States v. Studley*, 47 F.3d 569, 576 (1995) ("The acts ... within the scope of the defendant's agreement"), and there is no evidence that his agreement included more than aid to Saidakhmetov for his travel to Syria to fight with ISIS against Assad, or that he "intended to promote any plan by [the FTO] to commit a politically motivated crime of terrorism." (*United States v. Jumaev,* 2018 WL 3490886*5 (D. Colo. 2018)(Ex. 1 Rakhmatov Sentence Memorandum at p. 4).

Specifically with regard to the Terrorist Enhancement, the Second Circuit has rejected the government's argument that the Enhancement should be applied to one defendant because "his conspirators were acting in a manner 'calculated to influence or affect the conduct of the government.'" *United States v. Stewart (Yousry)*, 590 F.3d 93, 138-39 (2009). Were it otherwise, every person convicted of providing material support to an FTO of any kind, could be sentenced to the maximum as a full fledged member of the FTO responsible for all of its crimes, but that is not the law.

The government's attempt to have this Court sentence Mr. Rakhmatov as a global ISIS terrorist because he gave money to help someone fight with ISIS against Assad, is also contrary to empirical studies of tens of thousands of people

who have actually fought with ISIS in Syria against Assad. According to Dr. Marc Sageman in his initial report (Ex. 18 to Mr. Rakhmatov's sentencing memorandum) and in his addendum attached hereto, Ex. 2, responding to the government's sentence memorandum, "The vast literature and my own research on the tens of thousands of foreigners who went to Syria to join any group opposed to the Assad regime including ISIS, did so to fight the Assad regime ... not ... to join a terrorist organization" (p. 4). The government's "opinion that 'Rakhmatov cannot sever ISIS' opposition to the Assad regime from ISIS' other violent terrorist attacks' has no basis in evidence." (Sageman Addendum, attached hereto, Ex.2).

The government cites two cases in support of its argument that, despite the empirical evidence presented by Dr. Sageman and others that material support defendants are generally non-recidivists (Sentence Memorandum at pages 22-23 and Ex. 18; Sageman Addendum, attached hereto). Congress had "a rational basis" for concluding otherwise. (Gov't. Mem at 19-20). The government cites *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir, 2003), but that was a case against a professional jihadi warrier who planned to bomb LA Airport, where the Terrorist Enhancement was applied in a situation envisioned by Congress. *Meskini* was decided long before Dr. Sageman's studies and the other empirical studies. There is no rational basis, especially none for the extreme "draconian" Enhancement (*United States v. Jumaev, supra*, (Ex. 1 Rakhmatov Sentence Memorandum at p.4), that equates all material support defendants with "killers of non-Muslims"

5

(PSR Addendum, 11-2-20, at p. 1). And, *Meskini* acknowledges that, "A Judge determining that [the Enhancement] overrepresents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under §4A1.3 to depart downward in sentencing." 319 F. 3d at 92.

The Court in *United States v. Mumuni*, 946 F.3d 97, 112-13 (2d Cir. 2019), applied *Meskini's* lanuage about the Congressional rationale for severe sentences to the generic crime of "terrorism", not to the legally specific term of art, "federal crime of terrorism" as used in 18 U.S.C. §2332b(g)(5). It was referring to the crime of the defendant before it, who had attempted to murder a federal agent in the name of ISIS and who was planning an attack on police officers with a pressure cooker bomb (946 F.3d at 101-02), not to a money contribution to help defend against murder. And, in *Mumuni*, and the companion case *United States v. Rabbani, infra*, the government made distinctions among defendants which it appears to be blind to in this case. It asked for more than 17 years for Mumuni, but only 3 years for the co-defendant Rabbani who had attacked federal agents with a knife and participated in the bomb plot. See Ex. 17 to the Rakhmatov sentence memorandum, and *infra*, Point IV.

In this case, the government seeks the Court to regard all crimes containing a name derivation of the word "terror" as of equal harm and requiring maximum punishment. This is not the law of *Mieskini* and *Mumuni* or any other cases. "Even where a district court has properly calculated the Guidelines, it may not presume

that a Guideline sentence is **reasonable for any particular defendant**, and, accordingly, must conduct its own independent review of the §3553(a) sentencing factors." *United States v Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010) (emphasis added). The Second Circuit reverses a sentence when the defendant "appears to have been punished as though he already had, or would [commit the most heinous crime], despite [expert] testimony]to the contrary and [the defendant's] lack of any such criminal history." *Id* at 184.

The government is advocating the very kind of sentence for Mr.. Rakhmatov, for whom there is no history or evidence of jihad or "killing non-Muslims", that is condemned in *Dorvee, supra*, and in *Holder v. Humanitarian Law Project, supra*, at 16, emphasis added. ("Congress plainly spoke to the necessary mental state for a validation of §2339B, and it chose knowledge about the organization's connection to terrorism, **not specific intent to further the organization's terrorist activities**).

Such a sentence is particularly egregious when the Enhancement used to escalate the sentence is not empirically based, as 3A1.4 is not. *United States v. Dorvee, supra*; *United States v. Jumaev* 2018 WL 3490886, *10, n.15 (D. Colo 2018); *United States v. Alhaggagi*, 372 F.Supp 3d 1005, 1012 (N.D. Cal 2018); rev'd on other grounds  978 F.3d 693 (9th Cir. 2020). In fact, 3A1.4 is contrary to the empirical evidence of Dr. Sageman and others.

Some courts, confronted with the ill-defined, empirically bereft, and draconian nature of the Terrorist Enhancement, have required the government to

prove its applicability by clear and convincing evidence, rather than mere preponderance. *United States v. Alhaggagi*, 978 F.3d 639, 701, 703 (9th Cir, 2020); *United States v. Kikumura*, 918 F.2d 1084, 1100-1102 (3d Cir. 1990). The Second Circuit has adhered to the preponderance standard, but cautions:

> in certain cases, the enhancement of a sentence based upon a defendant's "relevant conduct," if done without regard to the weight of the evidence proving the relevant conduct, may result in a total term of incarceration which is excessive, inappropriate, and unintended under Sentencing Guidelines. See Gigante, 94 F.3d at 56 ("[T]he preponderance standard is no more than a threshold basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered with regard to both upward adjustments and upward departures. With regard to upward adjustments, a sentencing * 709 judge should require that the weight of the factual record justify a sentence within the adjusted Guidelines range .... Where a higher standard, appropriate to a substantially enhanced sentence range, is not met, the court should depart downwardly.")(emphasis omitted).

United States v. Cordoba-Murgas, 233 F.3d 704, 708-09 (2d Cir. 2000).

Mr. Rakhmatov submits that the increase from approximately five years to 15 years as a result of the Terrorist Enhancement should require an enhanced weight of evidence, but under whatever standard, the Enhancement fails.

II

THE GOVERNMENT DOES NOT SHOW THAT MR.
RAKHMATOV HAD THE "SPECIFIC INTENT" TO
"CALCULATE" OR "PROMOTE" A LEGALLY
COGNIZABLE "AFFECT" ON A "GOVERNMENT"
THEREFORE THE TERRORIST ENHANCEMENT
SHOULD NOT APPLY

The Terrorist Enhancement[3] should not be applied, because neither Mr.

Rakhmatov's offense of conviction, nor other allegations made against him by the

government, establish that Mr. Rakhmatov's "specific intent" was to calculate an

affect on a government by coercion and intimidation (18 U.S.C. §2332(b)(g)

(5)(A). The case on which the government relies, *United States v. Awan*, 607 F.3d

306, 317 (2010), defines the "calculation" element as "the object the actor seeks to

achieve through planning." Mr. Rakhmatov's only object planning was to provide

some money to satisfy Habibov to help Saidakhmetov get to Syria to fight with

ISIS against Assad. He was not involved in planning the specifics of

Saidakhmetov's involvement in Syria or the specifics of the fighting there.

Nor has the government shown evidence of Mr. Rakhmatov's "specific

intent" to affect or influence the conduct of the Assad regime, a "specific intent"

requirement the government does not even address. *Awan* holds that this specific

intent must be proved, and only then is the defendant's motive irrelevant (*Id* at

317).

---

[3] USSG §3A1.4, was erroneously numbered 3A1.5 in some places in Mr.
Rakhmatov's Sentencing Memorandum.

9

> Here, whatever Awan's motive might have been in committing the crimes for which he was convicted, commission of crimes listed in § 2332b(g)(5)(B) satisfies the "involved" prong of the terrorism enhancement **so long as the government shows by a preponderance of the evidence that Awan had the "specific intent,"** Stewart, 590 F.3d at 138, to commit an offense that was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5)(A).

*Id* at 317 (emphasis added).

The government relies on Mr. Rakhmatov's "general" intent to commit the crime of conviction, to give material support to a Foreign Terrorist Organization (Gov't. Mem. At 12), and, on his admission that he intended to aid in the fight against the Assad regime. There is no "specific" intent in these facts to affirmatively affect or influence the conduct of the Assad regime, only to help send someone there to fight to block its onslaught against the Muslim people of Syria. The evidence in *Awan* was that the defendant knowingly, and with specific intent, gave material support to an organization whose specific goal he knew to be the overthrow of the Indian government. Awan's motive was irrelevant because his specific intent to aid the overthrow of the government was proved.

In this case, there is no evidence of Mr. Rakhmatov's specific intent with regard to the Assad regime, other that to help another person defend against it, therefore his motive does become important. There is no evidence that that motive was to overthrow the regime or engage in positive aggression or political warfare against it, only to help send someone to help save the lives of those Assad sought

10

to slaughter. Any "affect or influence" that the act of helping the defensive fight might have had on the conduct of the regime was too speculative, tangential and remote to qualify for the Terrorist Enhancement. See cases cited in Mr. Rakhmatov's opening memorandum at pp. 2-9 and the discussion *infra*.

Otherwise, Senator John McCain's visit with groups of fighters to help them against Assad in Syria in May, 2013 could have been charged as a material support for terrorism and sentenced with the Terrorist Enhancement. And, to the extent that President Trump would have enlisted the aid of such groups in his plan, which he confessed to Bob Woodward, to have Assad assassinated, the charge and the Enancement could have been made against him.  "McCain Sneaks Across Turkey-Syria Border, Meets with Rebels." CBS News Election Live Updates. https://www.cbsnews.com/news/mccain-sneaks-across-turkey-border-meets-withrebels/;"Fact Check: Trump Admits Truth of Bob Woodward report About Assassinating Assad He Had Called Fiction'Two Years Ago." CNN Politics. https://www.cnn.com/2020/09/15/politics/fact-check-trump-fox-and-trends-assad-matis/index.htm. *United Stats v. Awan, supra* at page 316 posits that a person who murders a head of state to gain political favor affects the conduct of the government, regardless of his motive, and the act satisfies the terms of 18 U.S.C. §2332(b)(g)(5)(A), but it does not hold that such a murder in self defense against systematic massacre qualifies, and it does not hold that helping to fund a defensive fighter is in the same category of "conduct" as murder of the head of state, and it does not hold that the affect on conduct of the regime can be speculative.

If the "affect or influence conduct" language of the Guideline is so nebulously construed as to cover any act of material support that can be said to have "affected" the conduct of a government no matter how remote or justified, the Guideline would be subject to unconstitutional challenge as void for vagueness. *Lambert v. California*, 355 US 225 (1957). The Terrorist Enhancement Guideline is not mandatory and may be immune from constitutional challenge (*Beckles v. United States*, 137 S.Ct. 886 (2017)), but the Supreme Court applies the Rule of Lenity, which states "the Court will not interpret a federal criminal statute so as to increase the penalty that it places on an individual when such an interpretation can be based on no more than a guess as to what Congress intended." *Bifulco v. United States*, 447 U.S. 381, 387 (1980). As here, any affect on conduct of government was at best remote. If 18 U.S.C. §2332(b)(g)(5), the statute on which the Guideline relies for its definition of a federal crime of terrorism, includes any "affect or influence", no matter how speculative or remote it is unconstitutional under *Lambert, supra* and other lack of notice and void for vagueness cases.

It follows, as the Courts hold, that the material support conviction itself is not sufficient to justify the terrorist enhancement. *Holder v. Humanitarian Law Project, supra*; *United States v. Chandia*, 395 Fed.Appx 53, 60 (4th Cir. 2010). Nonetheless, the government's recitation of the evidence supporting the Enhancement in this case merely restates the facts of the conviction:

> the evidence set forth in the PSR and the stipulations in
> the Plea Agreement show by a preponderance of the

12

> evidence that Rakhmatov's conduct warrants application of the Terrorism Enhancement. There is no dispute that Rakhmatov provided financial support to Saidakhmetov to travel to Syria to fight on behalf of ISIS, that Rakhmatov discussed with Habibov the need to raise money for Saidakhmetov to purchase a firearm, and that Rakhmatov subsequently gave money intending to fund Saidakhmetov's travel to and expenses in Syria to fight on behalf of ISIS. Rakhmatov offense conviction therefore "involved" a "federal crime of terrorism because the conspiracy to provide material support to ISIS in violation of Section 2339B was "calculated to influence or affect the conduct of government by intimidation  or coercion or to retaliate against government conduct."

(Gov't Mem. At 12).

As argued in Point I, *supra*, Mr. Rakhmatov is only responsible for the conspiracy he joined, and there is no evidence that he intended, knew of, or joined, a conspiracy to establish a caliphate in Syria to kill non-Muslims, the government and Probation Department's inflammatory innuendo to the contrary, notwithstanding.

Nor, despite the government argument (Gov't. Mem. at 15), did Mr. Rakhmatov's offense affect the conduct of a "government." As set forth in Mr. Rakhmatov's sentencing memorandum at 19-23, the United States does not recognize the Assad regime as the government of Syria, because it murders its own population. The United States Attorney's office in this District in this case, however, argues that despite Assad's "reprehensible" conduct (Gov't. Mem. at 15) and the position of the State Department and other branches of the United States government, and other governments around the world, condemning Assad as a

criminal, this Court should regard his regime as a government in order to imprison Mr. Rakhmatov for 15 years for helping people to defend against him.

The government argues that this Court is not authorized to decide the application of the Terrorist Enhancement based on whether the Assad regime "is complying with its international obligations" or is "disfavored. " (*Ibid*). Mr. Rakhmatov is not asking the Court to make such unnecessary determinations; the Assad regime has already unequivocally been held to be criminal. There are no issues this Court needs to decide about Assad's compliance with law and morality, let alone its "international obligations", the regime is not "disfavored", it is officially condemned. The only authority the government cites for its argument, is a Sixth Circuit case holding that Israel was a government for the purpose of applying the Enhancement, even though it had violated a UN Security Counsel resolution. *United States v. Assi*, 428 Fed.Appx. 570, 574 (2011). That case is inapposite to one in which the "government" at issue has been totally outlawed and where the District Court need make no independent assessment.

Furthermore, the District Court is authorized to make its own determination that the application of a Guideline would be against public policy or empirical evidence and thereby refuse to apply it. *United States v. Dorvee*, 616 F.3d 174, 186-88, (2d Cir. 2010); *Gall v. United States*, 552 U.S. 38, 50 (2007); *Kimbrough v. United States*, 552 U.S. 85, 97-98, 110 (2007). For the reasons stated, it would certainly be absurd and against public policy and empirical evidence to maximize prison time against someone who intended to aid a fight against a criminal regime.

14

The criminal regime does not deserves the protection of law and the law does not protect it. See cases and legislative intent, at pages 5-9 of Mr. Rakhmatov's Sentence Memorandum.

The government also claims that the Terrorist Enhancement Guideline has been applied to acts affecting foreign governments, again citing *Assi, supra*, (Gov't Mem. at 14-15). The Court in *Assi*, however, relied on a Texas District Court decision (*United States v. DeAmaris*, 406 F.Supp.2d 748 (2006)), which acknowledged that it had found no authority for the proposition,  but based its conclusion on the fact that the word "government" is used in various sections of 18 U.S.C. §2332(b) without distinguishing between foreign and domestic governments. Overlooked by that Court is the fact that the entire statute, from which the definition of a "federal crime of terrorism" is taken at §2332(b)(g)(5), is a statute punishing extraterritorial crimes against "any person within the United States" (§2332(b)(a) (1)(A)) or "damaging any ... property within  the United States." (§2332(b)(a)(1) (B)).

Thus, the word "government" in the definition of "federal crime of terrorism" read in the context of the statute refers to the United States government, not to foreign governments, or, at most, to crimes against a foreign government, which crimes injure United States citizens or property, not at issue in this case. Furthermore, the definition of "federal crime of terrorism" in  §2332(b)(g)(5), is provided, not for the purpose of punishment, but only to authorize the Attorney General's "primary investigative responsibility." §2332(b). The other cases cited

15

in *Assi* either rely on *De Amaris* or do not address the question of whether conduct affecting foreign governments is included in the Terrorist Enhancement.

The government mischaracterizes Mr. Rakhmatov's argument by claiming that he only attacks the criminal history escalation of the Terrorist Enhancement (Gov't. Mem. at 20) The whole point of Mr. Rakhmatov's objections to the Enhancement is that it overstates both his offense and his criminal history, such that Mr. Rakhmatov,

> An ordinary first-time offender is therefore likely to qualify for a sentence ... rapidly approaching the statutory maximum, based solely on sentencing enhancements that are all but inherent to the crime of conviction. Consequently, adherence to the Guidelines results in virtually no distinction between the sentences for defendants like [Mr. Rakhmatov], and the sentences for the most dangerous offenders

United States v. Dorvee, 616 F.3d 174, 186-87 (2d Cir. 2010).

## III

## THE GOVERNMENT FAILS TO DISTINGUISH THE CASES WHERE THE COURTS DECLINED TO APPLY THE TERRORISM ENHANCEMENT

The government claims that the only reason the Terrorist Enhancement was not applied in the cases cited in Mr. Rakhmatov's sentence memorandum was that the government did not offer specific facts to support the Enhancement in those cases. (Gov't. Mem. at 14). This claim is false. Even on its face, the claim that the government sought the Enhancement without alleging supporting facts is not credible. In fact, in all of the cases, the government sought and argued facts in

16

support of imposing the Enhancement. It was not applied because the Courts found the government's facts insufficient, not because the government conceded. When the government did make concessions, they were to matters which it believed were irrelevant, such as the defendant's motive.

In *United States v. Stewart* (*Yousry*), *supra*, the government did **not**, as it claims in its memorandum (p. 14), concede that the Enhancement should not apply to Yousry. The government conceded only that Yousry lacked motivation or purpose (590 F.3d at 138), which it argues in this case is irrelevant for imposition of the Enhancement (Gov't. Mem. at 12). The government argued against Yousry that the Enhancement applied to him because he had helped pass a message from the leader of an FTO to his followers to continue violence against Egypt and because the conspiracy he joined included the goal of violence against Egypt. The Circuit rejected the government's arguments, as the Court should in this case, because Yousry's acts of material support did not establish that he "himself" had the specific intent to have an affect on the conduct of the Egyptian government.

In *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008), "the government argue[d] ... that the Court [ ] should infer the required intent from the basic facts that gave rise to the conviction", i.e. that Chandia provided materials for terrorist training exercises. The Court rejected the argument, because, as in this case, where the government relies on the facts of the conviction, providing materials to be used by an FTO (Gov't Mem. at 12), "these facts alone do not

17

support application of the enhancement ...  the facts underlying the conviction in this case were not violent terrorist acts." *United States v. Chandia, supra* at 376.

In *United States v. Sihae Cheng*, 2016 WL 413077 at #1 (D. Mass. 2016), the government sought imposition of the Terrorist Enhancement based on the defendant's sale of nuclear weapon parts to a terrorist state, but unlike its position in this case, it concluded that providing weapons to a terrorist organization was a non-violent crime and that the defendant's motivation, which it argues in this case is irrelevant, was only greed. The government did not believe that those concessions mattered, but the Court did, as should the Court in this case, where giving money that might have helped to provide a single gun was a non-violent crime, and Mr. Rakhmatov's motive was to defend against killing.

In *United States v. Shehadeh*, 2013 WL 6049001 (E.D.N.Y. 2013), the government argued that the defendant had committed a federal crime of terrorism by concealing from the FBI that his goal was to join the army to wage war against it. Judge Vitaliano of this Court, not the government, denied the Enhancement holding that the defendant's goal was inchoate, remote, and only a hope. In that case, the defendant's goal or hope was a war against the United States; here the goal was at most to defend people being massacred by a mass killer. *Shehadeh* is directly applicable to the declination of the Terrorism Enhancement in this case.

The defendant Jumaev in *United States v. Jumaev*, 2018 WL 3490886 (D. Colo. 2018)(Ex. 1 Sentence Memorandum), did not get the Enhancement because "there is no evidence in the record that he knew about, and certainly not that he

18

intended to promote any plan by the [FTO] to commit a **politically-motivated** crime of terrorism", even though he knew that that was the FTO's long range goal and sympathized with it. (*Jumaev, supra*, Ex. 1 to Mr. Rakhmatov's sentence memorandum at p. 5, emphasis added). See Points I and II, *supra*. And further, the Court held, the Terrorism Enhancement "is not backed by any empirical evidence. And ... treating all "terrorists" alike is impermissible under our sentencing paradigm ..." *Id* at p. 8. In this case, not only did Mr. Rakhmatov not have a "political" goal or plan, there is no evidence that Mr. Rakhmatov knew or sympathized with any such goal of ISIS.

The District Court in *United States v. Jumaev, supra*, had the legal acumen, honesty, and humanity to reject the government's "draconian" Enhancement argument against Jumaev (*Id* at p. 4). The government made full blown arguments about *Jumaev's* terrorist threat, but it downplays them in this case in or order to attempt to distinguish *Jumaev* from this case (Gov't. Mem. at 14). In *Jumaev*, it sounded in fear and innuendo, as it does against Mr. Rakhmatov. But there, as here, there was no evidence of what the government in *Jumaev* labeled "defendant's alarming trajectory of radicalization." (Sentence proceedings. July 18, 2018, *United States v. Jumaev,* 12 Cr. 33 JLK at p. 15, attached hereto, Ex. 3).

> His activity on line ... continued with the defendant's demonstrated volatility ... he gets emotional and that's why he did those things .... And so I think when you look at the evidence in this case, I would submit that $300 was merely the beginning, Your Honor. And, indeed, the defendant was almost compelled -- even after the arrest of his codefendant, he still was viewing violent rhetoric, he was still engaging in behavior that was stoking his

19

> own sense of injustice and what he claims is injustice
> towards Muslims.

*Id* at 15-16.

The Court in *Jumaev* was not swayed by those claims, which Judge

Vitaliano has said, "inflame the passion, but fail [ ] in law." *United States v.*

*Shehadeh, supra*, at *2. And the Court in this case is urged to do the same,

especially in this case where there is no online activity or any other activity,

verbal, or otherwise, by Mr. Rakhmatov of violent rhetoric.

### IV

> THE GOVERNMENT URGES THE COURT,
> CONTRARY TO THE MANDATE OF 18 U.S.C.
> §3553(a), AND IN RELIANCE ON ERRORS OF FACT
> AND INFERENCE , TO IMPOSE THE MAXIMUM
> SENTENCE BASED ON THE "NATURE OF THE
> OFFENSE", WITHOUT REGARD TO ITS
> "CIRCUMSTANCES", "THE HISTORY AND
> CHARACTERISTICS OF THE DEFENDANT" AND
> THE MOST "AFFECTIVE CORRECTIONAL
> TREATMENT"

Section 3553(a) of the United States Code requires a sentencing court to

consider (1) "the nature and circumstances of the offense and the history and

characteristics of the defendant", (2) (A) "the need for the sentence imposed to

reflect the seriousness of the offense" and (2) (D) "to provide the defendant with

needed correctional treatment in the most effective manner." Throughout its

sentencing memorandum, the government, and the Probation Department in its

filings, asks this Court to equate the seriousness of Mr. Rakhmatov's offense with

the killing of innocents, beheadings, and Muslim religious war against the United

20

States and to impose the maximum sentence. This is grossly false hyperbole .

Punishment according to the seriousness of the offense is a vague standard, and

the government's standard of how much prison time appears to diminish based on

the cooperation of the defendant, not on the seriousness of the offense.

It asked for only a three year sentence for the defendant in *United States v.*

*Rabbani, a.k.a. John Doe*, 15 Cr. 302 MKB (E.D.N.Y.) (gov't. sentence

memorandum, Ex. 17 to Mr. Rakhmatov's Sentence Memorandum), who actually

assaulted federal agents with a knife, plotted with the man in *United States v.*

*Mumuni*, 946 F.3d 97 (2d Cir. 2019) whom the Second Circuit held should get

more than 17 years, to construct a pressure cooker bomb,  and "exhibited a pattern

of conduct indicating an increased interest in physical violence coupled with

jihadist ideology." (Rabbani gov't. sentence mem, *supra,*. Ex. 17 to Rakhmatov

sentence memorandum, at p.2). The government asked for the sentence for

Rabbani,  one fifth as long as it seeks for Mr. Rakhmatov, even though Mr.

Rakhmatov has committed no assaults and plotted no acts of violence, let alone a

bomb, and Mr. Rakhmatov has exhibited no ideological, religious, ISIS prone

tendencies, whereas Rabbani "failed to engage in **truly catastrophic action** only

because of continued government intervention ... *Id* at 9 (emphasis added).

The government asserts that Rabbani was not convicted of material support,

hence the difference (Gov't Mem. at 25). But, as it concedes in its Rabbani

sentence memorandum *supra*, he was initialy charged with material support, and

notwithstanding that "the underlying facts demonstrate that the defendant's

conduct was significantly more dangerous than the minimal conduct required to

support a conviction for the charged offense", the government allowed him to

plead to impeding a federal officer. The fact that Rabbani was 18 or 19 years old

when he was planning the "catastrophe" with the pressure cooker bomb made him

far more dangerous, not less, and the fact that he cooperated after his arrest did not

suddenly erase his ideological devotion to ISIS, which he had acted on in the past.

The government warned of such dangers while at the same time opining that the

conditions of supervised release were enough to protect the public.

> in light of the defendant's conduct during the spring of
> 2015 indicating his increased interest in physical
> violence coupled with extremist ideology, his
> increasingly poor school attendance record during that
> time, his spending time with Saleh despite warnings from
> multiple individuals to stay away from Saleh in light of
> Saleh's demonstrated support for violent extremist
> ideology, and his efforts with Saleh to intimidate
> members of law enforcement while armed with tactical
> knives that ultimately led to his arrest in this case.

*Id* at 10.

Thus, there is no justification for imprisoning Mr. Rakhmatov, who gave

some money to a man to go to Syria who might buy a rifle there to defend against

a murderer, any more prison time than Rabbani. Mr. Rakhmatov has already

served more time than that.

But, in addition, the government ignores the other §3553(a) factors that the

Court must consider by law. "It has been uniform and constant in the federal

judicial tradition for the sentencing judge to consider every convicted person as an

individual and every case as a unique study in the human failings that sometimes

mitigate sometimes magnify the crime and punishment to ensue" *Koon v. United States*, 518 U.S. 81, 113 (1986). Not only has Mr. Rakhmatov not committed the heinous crimes the government, without evidence, wants the Court to sentence him for, but the "circumstances" of his actual offense, his "history and characteristics", and the "most effective correctional treatment" should result in a sentence far below the maximum by at least half.

As set forth in Mr. Rakhmatov's sentencing memorandum, the "circumstances of his offense were not those of a "jihadi", or Muslim war zealot, as the government labels him. He did not commit his offense for ideological or evil motive of any kind. He was indebted to Habibov who importuned him for the contribution, having relied on Habibov for work, advice on how to make a living in this country to which he immigrated with nothing. Habibov was the established businessman with connections to sources of cars and Iphones to sell and shopping mall kiosks in which to sell them, and Mr. Rakhmatov was willing under those circumstances then to help in the fight against Assad, even if ISIS was involved.[4] Prior to Habibov's importunement for the Syria trip contribution, Mr. Rakhmatov had made contributions in the past to charity as part of his obligation as a Muslim Uzbecki (See the Addendum of Prof. Adeeb Khalid, attached hereto, Ex. 4) and this charity included monetary help to those and their families fighting in Syria

---

[4] Attached hereto as Ex. 5 are transcripts of two telephone conversations between Mr. Rakhmatov and Habibov, recently disclosed by the government. The conversations illustrate very well Mr. Rakhmatov's deference to his mentor Habibov and his reliance on Habibov for advice and sources of income.

against the massacres conducted by Assad against Muslims. None of those contributions, as far as Mr. Rakhmatov knew or intended, went to ISIS. The government proffers no evidence to the contrary.

Failure of the Court to factor in these circumstances of the offense in its sentence would be, Mr. Rakhmatov submits, a violation of §3553(a), as would be the failure to account for Mr. Rakhmatov's exemplary "history and characteristics" of a law abiding, artistic, life of work, devotion, and giving to his family, friends, and fellow inmates in prison. Commendations from his family, prison officials, chaplains, counselors, everyone he's been in contact with in his life, are universal and memorialized in the sentence memorandum and Exhibits (pages 27 -32), and in the videos from friends and family in Uzbekistan, submitted to the Court under separate cover.[5]

Mr. Rakhmatov is a good man who made a mistake he has acknowledged. He did not think beyond satisfying Habibov with a contribution he believed was going for a good cause. For that he must be punished, with consideration given to "needed correctional treatment in the most effective manner." §3553(a)(2)(D).  A long prison term will not accomplish that. In addition to his pre-offense life of good character and good works, Mr. Rakhmatov has demonstrated four years of additional good works in prison that reaffirm his character and lack of

---

[5] Attached as Ex. 6, is a summary of a recently received video made by Mr. Rakhmatov's mother and daughter, in Uzbekistan. His mother tells how Mr. Rakhmatov gave his time to help a girl dying from a brain tumor. The video is being sent separately

dangerousness. Dr. Marc Sageman's opinion, based on  knowledge of Mr.
Rakhmatov, the case against him, and the thousands of other defendants convicted
on terrorism charges of various degrees that he has studied, is more evidence that
Mr. Rakhmatov is not a danger of recidivating.  And, Judge Kane's caution in
*United States v, Jumaev, supra*, against the "negative influences" of long
incarceration, including the lack of mind improving programs and the danger of
radicalization also argue for a lesser prison term for Mr. Rakhmatov.(Sentence
Mem. at 40).

The government's insistence that Mr. Rakhmatov's contribution of money
was a violent act because it furthered Saidakhmetov's plan to buy a rifle and fight
with ISIS is wrong, and ultimately irrelevant. Any act in a chain, no matter how
long, can be labeled violent.  Giving money does not inflict physical damage to
person or property. See *United States v. Chandia, supra* at 376. If it were
considered violent, all material support convictions could be labeled violent,
thereby closing the door to individualized sentencing and the distinctions required
by *United States v. Koon, supra*. The Courts have made those distinctions, thus the
act of shipping nuclear weapon supplies to Iran (*United States v. Sihai Cheng,
supra*), conspiracy to murder by passing messages (*United States v. Stewart
(Yousry), supra*), and supplying terrorist training materials to an FTO (*United
States v. Chandia, supra*) were considered non-violent by the courts. See also
cases at Sentence Memorandum, pp. 6, 16-17.

The government attempts to extrapolate from selected words, and their absences, in Mr. Rakhmatov's conversations with Habibov to claim that Mr. Rakhmatov was "well versed in what it meant to travel to Syria to join and fight on behalf of ISIS" (Gov't. Mem. 18). The bits the government chooses do not support that inference, and the term"well versed" is more hollow hyperbole. Mr. Rakhmatov's statement that Saidakhmetov could get a gun in Syria displayed no knowledge, only a surmise that anyone would make about the fighting there. The use of code words during the conversation is just as consistent with Habibov's fear of monitoring by the Uzbeki government, as he testified at the trial of Dilhayot Kasimov (Sentence Mem. Ex. 6), and Mr. Rakhmatov has not denied knowledge that ISIS was a terrorist organization. That Saidakhmetov's name was not mentioned is explained by the fact, conceded by the government, that Mr. Rakhmatov did not know Saidakhmetov or Juraboev.

The government's labeling and innuendo continue with its mischaracterization of the so-called religious "network" of alleged financiers of ISIS. (Gov't. Mem. at p.3). There is no evidence that the traditional Uzbeki cultural grouping of friends, for socializing and giving charity, the Choyhana or tea party, was anything more than that in this case, among the struggling Uzbeki immigrant community. The government claims it began in 2012 to support ISIS, but there was no ISIS in 2012, and the Choyhana has existed as a cultural institution for centuries. (See addendum report of Dr. Adeeb Khalid, Ex. 4 attached). Even the government's cooperating witness, Habibov, was forced to

testify under cross-examination that the purpose of the Choyhana was social aid (Habibov testimony, attached hereto, p. 174).

Mr. Rakhmatov's membership does not carry the nefarious weight the government would like the Court to accord it, because, other than the single contribution offense of conviction, there is no evidence that Mr. Rakhmatov knowingly made any contribution to ISIS through  the Choyhana or otherwise. In fact, the $400 contribution he made for Saidakhmetov's travel, was his own money.  During the telephone conversations with Habibov, Mr. Rakhmatov was reluctant to try and get money from other people, expressed pessimism about his ability to do so, and finally he used only his own money for the $400.

For example, in the remainder of the conversation partially quoted by the government on page 5 of its memorandum, after Mr. Rakhmatov tries to discourage as unnecessary the raising of money for a weapon for Saidakhmetov, Mr. Rakhmatov tells Habibov "I don't think we can do two. Presently I had ... don't have spare ... They will have to use what they get." In a conversation on February 19, Habibov asks if Mr. Rakhmatov has told others about the money to be raised, and Mr. Rakhmatov answers, "You go ahead and tell them." And in the conversation at pages 6 and 7 of the government's memorandum, Mr. Rakhmatov is quoted as saying that other brothers have not been making their regular dues payments to the Choyhana ("falling asleep and missing the last 2 - 3 Friday prayers") ("falling asleep [even] for regular ones"). In the end, the $400 Mr. Rakhmatov transferred for Saidakhmetov was all his own money. The earlier

transfer of $100 to Zakirov, who was Habibov's business partner, was for expenses owed Habibov for the buying and selling Mr. Rakhmatov was doing with him and for the kiosk expenses. There is no evidence of the source of the $1600 that Kasimov delivered to Saidakhmetov at the airport just before his arrest.

The fact that members of the Choyhana discussed fighting against Assad in Syria does not make them, or Mr. Rakhmatov, supporters of ISIS. As has been argued in Mr. Rakhmatov's sentencing memorandum and here, and not contradicted by the government, fighting against the murderous, criminal regime in Syria is not the same as adopting the goals of ISIS.

Mr. Rakhmatov did meet Habibov in Brooklyn, and, although he denies that a discussion of the money for the traveler to Syria occurred at that meeting, he admits that a similar discussion, with one exception, occurred on the telephone. He denies, and the government does not dispute the denial, that he offered to put the traveler in contact with someone in Turkey (Gov't. Mem. at 9).

The government argues that Mr. Rakhmatov's debts to Habibov were not part of his motivation for making his contribution. It focuses on the $400 Iphone deal, but Mr. Rakhmatov's obligations to Habibov extended way beyond that single deal, to Habibov's mentoring of Mr. Rakhmatov from the beginning of his arrival in the country, through Habibov's lending him his kiosk leases so he could sell Iphones and splatt balls and other items in shopping malls, and advising him on buying and selling used cars at auction for resale and rental to Uber drivers.

28

Regarding the Iphones, the government claims that subsequent telephone conversations show that the $400 Iphone deal did not come to fruition. (Gov't Mem. at 24; Ex. 5 attached hereto). In fact, the new conversations, revealed by the government for the first time after Mr. Rakhmatov's sentencing memorandum was filed, despite Mr. Rakhmatov's pretrial requests[6], show that Habibov was having difficulties getting the Iphones, but that he was continuing to try to get them and negotiations were ongoing. The attempt ended because Habibov was arrested. The government argues that Mr. Rakhmatov was not contributing the $400, even in part due to the Iphone deal, because he never said so to Habibov. This argument misunderstands that Muslim/Uzbeki culture precludes open discussion of debts and obligations. See the addendum report of Professor Adeeb Khalid, attached hereto, Ex. 4).

## V

### MR. RAKHMATOV'S UNTREATED AND IMPROPERLY TREATED MEDICAL AND DENTAL CONDITIONS SHOULD BE ADDRESSED IN SENTENCING

As argued in Mr. Rakhmatov's sentence memorandum (pp. 36-39), his four years of imprisonment at the MCC have included physically and mentally debilitating conditions. On October 10, 2019, this Court ordered that the MCC

---

[6] *F.R. Crim P. 16 (a)(1)(B)*: "Upon a defendant's request, the government must disclose to the defendant ... any relevant written or recorded statement by the defendant ..."

"shall forthwith cause dental and medical treatment to be given to [him] to ensure, to the fullest extent that dentistry and medicine can provide, that [his] teeth are repaired, maintained, and no longer cause him pain, and that blockage of his sinuses and nasal passages are cleared and remain so."

The order has not been followed. Although Mr. Rakhmatov was seen by a dental technician and some work was done on a painful tooth, the technician told him that he needed root canal but that MCC could not provide it. He is still in pain. He was seen for nasal blockage, and was told he needed to be treated by an allergist, but has not been. He still experiences nasal blockages and periodically suffers redness in around his eyes and red bumps or hives on his skin. Mr. Rakhmatov has been asking for glasses for over a year, to no avail. He cannot see at a distance.

All of these conditions are exacerbated by the Covid 19 pandemic. "Nine months into the pandemic, the coronavirus continues to spread unchecked across the federal prison system." "Federal Prisons Keep Turning Into Nightmares.' 'Everyone Looks Like Death." Vice News, 11–12-20. vice.com/en/article/ n7yba8/federal-prisons-keep-turning-into-covid-nightmares-everyone-looks-like-death. Restrictions of inmates to their cells without fresh air and recreation increase illness and other conditions. The Court is urged to take these sickening conditions into account, the hardship and extra-punitive four years time he has already spent in prison, and the life-threatening conditions to follow, in the length of any future time it will impose, and it is urged to include in its judgment that the

medical,  dental, and opthalmlic conditions be optimally treated. In the interim
between  sentencing and any transfer to any designated prison, the Court is
requested to issue another order to the MCC that Mr. Rakhmatov be treated further
by root canal and allergy specialists, and that he be provided with corrective
lenses. A proposed order is attached.

<u>VI</u>

MR. RAKHMATOV HAS NOT VIOLATED HIS PLEA
AGREEMENT BY EXPLAINING THE MOTIVES
AND INFLUENCES THAT LED HIM TO INTEND TO
<u>PROVIDE MATERIAL SUPPORT TO AN FTO</u>

The government at a few places in its memorandum suggests that Mr.
Rakhmatov violated his plea agreement by stating in his sentencing memorandum
that he gave money to Habibov to pay off a debt that he owed to Habibov (Gov't
Mem. at 10; See also pp. 11n, 24). First, Mr. Rakhmatov has not stated anywhere
in his sentence memorandum that "he gave money to Habibov to pay off a debt" to
Habibov. The statement in his memorandum at page 26, cited by the government,
is in a section on the context in which the offense occurred.

> On February 7, 2015, Mr. Rakhmatov and Ahbor
> Habibov had a long 20 minute conversation in which Mr.
> Rakhmatov sought advice from Mr. Habibov about how
> to buy used cars to rent to Uber drivers and about the
> purchase of used Iphones from Mr. Habibov for $400 for
> resale ... later [on February 24] he deposited $400, the
> cost of the Iphones he was seeking to buy from Habibov
> for resale."

This states only the fact that the deposit of $400 was in the same amount as
the cost for the Iphones; it does not state that the reason or intent of the deposit

31

was solely to pay for the Iphones. Throughout the sentence memorandum Mr. Rakhmatov explains that keeping the Iphone deal alive was only one of the motives for giving money to Habibov, and that ultimately his intent was to help Saidakhmetov travel to Syria to fight with ISIS against Assad.

Repeatedly throughout his sentence memorandum and reiterated in this reply, Mr. Rakhmatov clearly states that his intent was that of the plea agreement (Sentence Mem. at 5, 9, 23), but he does argue that the intent was underpinned by his obligations to Habibov over the many years Habibov gave him the means to earn money, including getting Iphones on the cheap for resale, and by his motives to help in the defense of Muslims being massacred by Assad.

The government conflates motive and intent to argue that Mr. Rakhmatov negates his criminal intent by claiming good motives, while in the same memorandum arguing that motive and intent are different and that "Rakhmatov's motive for committing the offense of conviction - even if humanitarian - is legally irrelevant for purposes of the guidelines." (Gov't. Mem. at 13).

Freshman prosecutors, let alone seasoned ones, know very well that motive and intent are legally different for purposes of criminal conviction; intent is an element of the crime, motive is not, and prosecutors are absolved from proving motive. Only intent is necessary for conviction, a charge to the jury prosecutors often request and receive. *United States v. Caban*, 173 F.3d 89, 94 (2d Cir. 1999). Here, intent has been proved by Mr. Rakhmatov's admission. "The erroneous assumption that [Mr. Rakhmatov's] good motive for committing a crime is

inconsistent with criminal intent" (*United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984)) is not one the Court should adopt at the seemingly unknowing behest of the government. *United States v. Simon*, 425 F.2d 796, 808-09 (2d Cir. 1969). (Friendly, J.)The Second Circuit notes the distinction between the concepts of motive and criminal intent concluding that "even if no motive were shown at all the government could still prove the requisite intent." *United States v. Awan, supra*, at 317.

## CONCLUSION

FOR THE ABOVE STATED REASONS AND THOSE IN MR. RAKHMATOV'S OPENING SENTENCE MEMORANDUM, THE COURT SHOULD SENTENCE MR. RAKHMATOV TO TIME SERVED OR AT MOST TO THE MINIMUM GUIDELINE SENTENCE WITHOUT ENHANCEMENTS, AND SHOULD ORDER THE REQUESTED MEDICAL, DENTAL, AND OPTHALMIC TREATMENT FOR HIM, AND SHOULD ORDER DELETION OF THE INFLAMMATORY  LANGUAGE FROM THE PSR AND ADDENDUM

Respectfully submitted,


  s/Lawrence Mark Stern
LAWRENCE MARK STERN
100 Hudson Street, #6A
New York, NY 10013
(212) 925-6863
Attrorney for Azizjon Rakhmatov